[Civ. No. 38961. Second Dist., Div. One. Dec. 17, 1971.]

WILLIAM T. FARR, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Cooper & Nelsen and Grant B. Cooper for Petitioner.

Robert C. Lobdell, Gibson, Dunn & Crutcher, Robert S. Warren, Dean S. Lesher, George R. Johnson, Flint & Mac Kay, Edward L. Compton, R. Garrick Ritchie, Edwin Freston, Jack B. Purcell, William Whitsett, McCutchen, Black, Verleger & Shea, Howard J. Privett, Bodle, Fogel, Julber & Reinhardt, George E. Bodle, Daniel Fogel, Stephen Reinhardt, and Earl Klein as Amici Curiae on behalf of Petitioner.

John D. Maharg, County Counsel, and William F. Stewart, Deputy County Counsel, for Respondent.

No appearance for Real Party in Interest.

**OPINION**

**THOMPSON, J.** — This is a petition for writ of review of an order of respondent court adjudging petitioner Farr to be in contempt for failing to answer questions put to him. We conclude that the trial court properly found petitioner to be in contempt of court.

The matter at bench is an outgrowth of the trial of Charles Manson and

his codefendants for two sets of multiple murders. The crimes themselves and the ensuing trial were the subjects of much sensational notoriety. Early in the proceedings the superior court entered an order re publicity. That order prohibited any attorney, court employee, attaché, or witness from releasing for public dissemination the content or nature of any testimony that might be given at trial or any evidence the admissibility of which might have to be determined by the court. The order became effective December 10, 1969, and remained in effect throughout the trial..

On October 5, 1970, during the course of the trial, Stephen R. Kay, one of the deputy district attorneys assigned to the prosecution of the Manson case, obtained a written statement from Mrs. Virginia Graham, a potential witness. The statement recites that Susan Atkins, a codefendant in the murder prosecution, had confessed the crimes to Mrs. Graham in lurid detail and implicated Manson. It states that the defendants planned after the murders to cross the country by bus and in the course of their travels to murder people at random. Miss Atkins purportedly told Mrs. Graham that she and her codefendants had planned to murder a series of show business personalities each in a particularly vicious and bizarre manner. Included in the list of intended victims were Elizabeth Taylor whose eyes were to be removed and mailed to an ex-husband, Richard Burton who was to be castrated, Frank Sinatra who was to be skinned alive while hanging from a meat hook, and Tom Jones whose throat was to be cut while he was engaged in an act of sexual intercourse with Miss Atkins at knife point if necessary. Steve McQueen was also mentioned as a potential victim.

Copies of the Virginia Graham statement were prepared by the prosecution and at the court's instruction were delivered one to each attorney then appearing for the defense and one to the trial court. No other copies of the statement were released. The statement was edited to exclude inadmissible matter in preparation for Mrs. Graham's testimony. In October 1970, petitioner Farr was a reporter for the Los Angeles Herald Examiner, a daily newspaper. He learned of the Graham statement. Although aware of the content of the December 10, 1969, order re publicity he contacted three persons subject to the court order seeking a copy of the statement. Farr told his potential sources of the statement that he would keep confidential the identity of the source. He received two copies of the statement on October 7, each from an attorney of record in the murder trial and one copy on the morning of October 8 from a person subject to the order re publicity who may or may not have been an attorney of record.

On October 8, 1970, Robert Steinberg, an attorney representing Mrs. Graham, told the trial court that it had come to his attention "that one

of the defense lawyers" had released the Graham statement to Farr. At an in-chambers hearing, Judge Older, presiding over the Manson trial, asked Farr if the Herald Examiner intended to print a story based upon the statement. He also sought the identity of the persons who had given a copy to Farr. While informing the court that he had copies of the Graham statement, Farr refused to disclose the sources of it, asserting the immunity from contempt granted to newspapermen by Evidence Code section 1070. On October 9, Farr's story bearing his by-line and headlined "Liz, Sinatra on Slay List—Tate Witness" appeared in the Herald Examiner. The story repeated the sensational, gory details of planned murders contained in the Graham statement as well as material in the statements implicating Manson in the murders already committed. Mrs. Graham testified in the Manson trial on October 10. Much of the matter contained in the statement given by her to Kay and printed in the Herald Examiner story was not permitted in evidence.

Manson, Miss Atkins, and their codefendants were found guilty of the counts of murder charged against them and were sentenced to death. An automatic appeal to the Supreme Court is now pending. After judgment in the Manson case the trial court, on May 19, 1971, convened a hearing to determine the source of the Herald Examiner story recounting the Graham statement. At the outset, the trial court announced that the purpose of its hearing was to determine whether there had been a violation of its order re publicity which had jeopardized a fair trial for the defendants in the Manson case.

By May 19, Farr had terminated his position with the Herald Examiner and accepted employment as press secretary to the Los Angeles District Attorney, the prosecutor in the Manson trial. Farr was called as the first witness at the hearing. He stated that with knowledge of the order prohibiting the disclosure he had obtained copies of the Graham statement from two of the attorneys of record in the Manson trial and identified the members of the group to which those two belonged as Mr. Bugliosi, Mr. Musich, and Mr. Kay, all deputy district attorneys, and Mr. Kanarek, Mr. Shinn, and Mr. Fitzgerald, counsel for various of the defendants.[1] Having received that information, the trial court recessed the hearing to permit interrogation of the attorneys designated by Farr.

Messrs. Bugliosi, Musich, Kay, Kanarek, Shinn, and Fitzgerald were subpenaed. Each testified under oath in effect denying that he had directly or indirectly furnished the Graham statement to Farr. Members of the

---

[1] Ronald Hughes, counsel for one of the defendants in the Manson trial, died during the trial. Farr acknowledged that Mr. Hughes was not a source of the Graham statement.

prosecutorial team strongly intimated that the statements must have come from one or more of defense counsel. The attorneys for the defense intimated with equal strength that the source was the prosecution. The trial court again recessed the hearing to permit further questioning of Farr.

The hearing resumed, and a series of questions was asked of Farr. He acknowledged that he had obtained three copies of the Graham statement, two from attorneys of record, members of the previously identified group of six, and one from a person subject to the court order but whom Farr refused to disclose as either included or excluded from the group of six. He refused to answer a series of questions asking the identity of the persons who had furnished the Graham statement to him including specific interrogation naming each lawyer in the group of six previously disclosed. Farr similarly refused to answer questions seeking to ascertain the places where he had obtained the copies of the statements, the attorneys of record approached by him to obtain the statement and to whom he had given a promise of confidentiality of source, a question asking whether a source of the statement was an associate of an attorney of record, and a question asking whether a copy of the statement had been obtained from the office of the district attorney. Farr justified his refusal to answer by reference to Evidence Code section 1070. In each instance of a refusal to answer the court ordered an answer on penalty of contempt. After a further refusal the court held Farr to be in direct contempt. It ordered him incarcerated in the county jail until he answered the questions but stayed its order to permit Farr to pursue this writ of review.

In this proceeding, petitioner Farr contends: (1) the judgments of guilt entered in the Manson trial and the automatic appeal of those judgments to the Supreme Court deprived the trial court of jurisdiction over the trial so as to render it powerless after judgment to conduct a hearing into the circumstances of the purported breach of the order re publicity; (2) petitioner Farr is granted immunity from punishment for contempt by Evidence Code section 1070 because he was a "newspaperman" when he solicited and received the Graham statements although he was no longer a "newspaperman" at the time of the hearing; and (3) the sources of the Graham statements are protected from disclosure by a First Amendment privilege. Amici curiae who have filed briefs in support of petitioner's position contend, in addition, that the order re publicity is void because it constitutes an unconstitutional restriction upon freedom of the press. We conclude that the judgment of contempt is valid.

### Jurisdiction of Trial Court

Petitioner contends that the trial court was without jurisdiction

to proceed with its inquiry into possible violations of its order re publicity. He argues that the trial of the Manson matter had ended before the inquiry commenced and concludes that by reason of the end of the principal action the court, if it desired to institute punishment for contempt of an order made in the course of the trial, was limited to referring the matter to the city attorney for appropriate action.

A contention identical with that made by petitioner here has been made to the Court of Appeal in an earlier case and rejected by it. There a dissatisfied litigant had accused the court reporter of tampering with the record and one of the counsel in the case with unethical solicitation of litigation. The trial out of which the complaint arose had been terminated by a voluntary dismissal. The trial court nevertheless conducted a hearing to determine the validity of the charges. Two witnesses called at the hearing refused to testify and were held in contempt. On review of the contempt adjudication the witnesses contended that jurisdiction of the trial court over the principal action having terminated, it no longer could proceed with the hearing on the allegations of misconduct by the reporter and counsel. They argued that the sole remedy lay in a criminal contempt prosecution instituted by the district attorney. The Court of Appeal rejected the contention holding that the trial court had power to proceed and that the witnesses were in contempt of the court for refusing to answer questions put to them in the course of the hearing. It said: "It may be conceded that if an unverified complaint were presented against a person who had no connection with the court or with any adjourned or pending proceeding before it the judge might be warranted in declining to file and consider it. Ordinarily, complaints charging crime are filed in a justice or municipal court. . . . However, the same does not hold true as to a court reporter, who is an adjunct of the court. . . . Neither does it apply to counsel who have conducted a trial or other hearing before the superior court. And the court's power does not end with the right to control 'its ministerial officers and all other persons in any manner connected with a judicial proceeding,' but also in furtherance of justice it may 'compel the attendance of persons to testify in an action or proceeding pending therein.'" (*Whitlow* v. *Superior Court,* 87 Cal.App.2d 175, 182 [196 P.2d 590], hg. den.) ■ Our Supreme Court has recently cited *Whitlow* with approval in a decision upholding the proposition that a trial court retains the power to punish for contempt occurring in an action although the principal action itself has terminated. (*Morelli* v. *Superior Court,* 1 Cal.3d 328, 332 [82 Cal.Rptr. 375, 461 P.2d 655].)

■ In the case at bench the trial court was faced with information that two of the six trial counsel who had conducted a case before it were

guilty of serious misconduct. It was both empowered and duty bound to inquire into the validity of the information. Significantly, in the early stages of its inquiry it became apparent that the prosecution in the principal case was asserting the position that the Graham statements had been given to Farr by defense counsel while the attorneys for the defense implied equally that the statements had emanated from the prosecution. Judge Older could not, if he recognized his duty as a judicial officer, blind himself to the likely possibility that the question of prejudicial publicity would be an issue on appeal of the principal case. Rather, he was required to do as he did—risk the disapproval of the powerful press and mass electronic communication media to ascertain at an early date facts which could assist the resolution of that issue on appeal and determine the complicity of the officers of his court in violations of an order which would have prevented the issue from arising. If the members of the prosecution team leaked the Graham statements to Farr the issue of the prejudicial nature of those statements may merit serious consideration on appeal. (*Sheppard* v. *Maxwell,* 384 U.S. 333, 360-361 [16 L.Ed.2d 600, 618-619, 86 S.Ct. 1507]; *People* v. *Brommel,* 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845].) If the leak emanated from counsel for the defense the situation is materially different. The necessity for inquiry into Farr's sources of the statement is particularly acute in the matter at bench. At the time he was required by respondent court to reveal his source, Farr had become press secretary of the prosecution.

We thus conclude that the inquiry conducted by the trial court was necessary to its duty to control its own officers, counsel appearing before it. We conclude, also, that in the peculiar facts of the matter at bench the inquiry was necessary to discharge the duty of the trial court to perfect a record pertaining to an issue likely to arise on appeal and an equally important duty to protect the integrity of the very process of prosecution and defense of the principal case, the Manson trial. The necessity of the inquiry impels the ultimate conclusion that the trial court was empowered to require the attendance of witnesses and compel their testimony pertinent to the objects of the hearing.[2]

## Evidence Code Section 1070

 Petitioner contends that the adjudication of contempt must be annulled because of the immunity from contempt provided in Evidence Code section 1070. That section states: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, or by a press association or wire service, cannot be adjudged in contempt by a court,

[2]There is an implication in the briefs of amici that Judge Older should have referred the proceeding here involved to another judge rather than conducting it himself. No objection on that ground was tendered in the trial court.

the Legislature, or any administrative body, for refusing to disclose the source of any information procured for publication and published in a newspaper. Nor can a radio or television news reporter or other person connected with or employed by a radio or television station be so adjudged in contempt for refusing to disclose the source of any information procured for and used for news or news commentary purposes on radio or television."

Section 1070 read strictly does not include petitioner within the scope of its immunity. At the time of the hearing at which he refused to answer questions he was not a person described in the section. Petitioner argues that section 1070 must be construed broadly to include within its immunity a person who occupied a described status at the time he acquired the information whose source is sought although he no longer occupies the status when disclosure is required. He contends that otherwise the underlying purpose of the statute, the encouragement of free flow of information to the public, will be impaired by the reluctance of persons to communicate with reporters because of the possibility of the revelation of their identity if the reporter's status changes. Respondent counters with the argument that Evidence Code section 1070 is considerably less than an all embracing effort to aid the flow of information by protecting sources. Thus, respondent notes that the section, while immunizing persons connected with newspapers, radio, and television from contempt for failure to reveal a source does not protect persons connected with magazines, free lance authors, lecturers, or pamphleteers. (*Application of Cepeda,* 233 F.Supp. 465, 473; cf. Comment, 6 Harv. Civ. Rights-Civ. Lib. L.Rev. 119, 130.)

On the narrow facts of the case at bench we do not reach the issue of construction of Evidence Code section 1070 as protecting former members of the newspaper, radio, and television profession from liability to the sanction of contempt. To construe the statute as granting immunity to petitioner Farr, in the face of the facts here present would be to countenance an unconstitutional interference by the legislative branch with an inherent and vital power of the court to control its own proceedings and officers.

█ The power of contempt possessed by the courts is inherent in their constitutional status. While the Legislature can impose reasonable restrictions upon the exercise of that power or the procedures by which it may be exercised (*In re McKinney,* 70 Cal.2d 8 [73 Cal.Rptr. 580, 447 P.2d 972]), it "[cannot] declare that certain acts shall not constitute a . . . contempt." (*In re San Francisco Chronicle,* 1 Cal.2d 630, 635 [36 P.2d 369].) Thus, former subdivision 13 of Code of Civil Procedure section 1209 which provided: "[N]o speech or publication reflecting upon or

concerning any court or any officer thereof shall be treated or punished as a contempt of court unless made in the immediate presence of such court while in session and in such a manner as to actually interfere with its proceedings" was held unconstitutional by our Supreme Court as an invalid legislative effort to abridge the inherent power of the court. (*In re San Francisco Chronicle, supra.*)

 If Evidence Code section 1070 were to be applied to the matter at bench to immunize petitioner from liability, that application would violate the principle of separation of powers established by our Supreme Court. That application would severely impair the trial court's discharge of a constitutionally compelled duty to control its own officers. The trial court was enjoined by controlling precedent of the United States Supreme Court to take reasonable action to protect the defendants in the Manson case from the effects of prejudicial publicity. (*Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507].) It performed its duty by issuing the order re publicity. By petitioner's own statement that order was violated by two attorneys of record, of a list of six counsel in the case. Those attorneys were officers of respondent court. By petitioner's own statement the violations occurred because of his solicitation. Respondent court was both bound and empowered to explore the violations of its order by its own officers. (*Wood* v. *Georgia,* 370 U.S. 375, 383 [8 L.Ed.2d 569, 576, 82 S.Ct. 1364];[3] see also, Wright, *Fair Trial and Free Press,* 54 Judicature 377, 381; and Mosk, *Free Press and Fair Trial—Placing Responsibility,* 5 Santa Clara Law. 107, 119;[4] Cooper, *The Rationale for the ABA Recommendations,* 42 Notre Dame Law. 857.)

Without the ability to compel petitioner to reveal which of the six attorney officers of the court leaked the Graham statement to him, the court is without power to discipline the two attorneys who did so, both for their violations of the court order and for their misstatement to the court that they were not the source of the leak. Equally significant is the proposition that petitioner tarred six counsel with the same brush. Unless the court compels him to reveal which two of the six violated their professional obligation, four reputations of officers of the court will remain unjustly impaired.

We thus conclude that Evidence Code section 1070 cannot be applied

---

[3]"[C]ourts necessarily must possess the means of punishing for contempt when conduct tends directly to prevent the discharge of their functions" including "the authority and power . . . to assure litigants a fair trial, . . ."

[4]"[C]ourts must be prepared to deal firmly with lawyers who choose to conduct their litigation in the forum of newspaper columns or television, instead of in the courtroom."

to shield petitioner from contempt for failure to reveal the names of the two attorneys of record in the Manson trial who furnished him with copies of the Graham statement. A closer question exists with respect to petitioner's refusal to divulge the identity of the third person, possibly not an attorney of record but subject to the order re publicity who gave him a copy of the statement. Here the court's power to compel an answer in the face of Evidence Code section 1070 must rest primarily upon the necessity of disclosure as a means of enforcement of its obligation to prevent prejudicial publicity emanating from its attachés or the office of the prosecuting attorney. We conclude here, also, that section 1070 if applied to immunize petitioner from contempt would unconstitutionally interfere with the power and duty of the court. The record is clear that the only persons other than attorneys of record who had access to the Graham statement and who were subject to the order re publicity were attachés of the court and members of the district attorney's office. The mandate of the United States Supreme Court that the trial court control prejudicial publicity emanating from such sources (*Sheppard* v. *Maxwell, supra,* 384 U.S. 333) can be discharged only if that court can compel disclosure of the origins of such publicity.[5]

### Freedom of the Press

Petitioner argues that the freedom of the press guaranteed by the First Amendment to the United States Constitution precludes inquiry into a reporter's sources of news. While existing decisional law does not support that position (see Note, *Reporters and Their Sources: The Constitutional Right to a Confidential Relationship,* 80 Yale L.J. 317, 318, fns. 5, 6; Comment, 6 Harv. Civ. Rights-Civ. Lib. L.Rev. 119, 120, fns. 9, 10), the recent grant of certiorari by the United States Supreme Court in three cases indicates a substantial possibility of change in the concept of the scope of protection afforded by the First Amendment to news sources. (*Caldwell* v. *United States,* 434 F.2d 1081, cert. granted *sub nom. United States* v. *Caldwell,* 402 U.S. 942 [29 L.Ed.2d 109, 91 S.Ct. 1616]; *In re Pappas* (1971) —— Mass. —— [266 N.E.2d 297], cert. granted *sub nom. Pappas* v. *Smith,* 402 U.S. 942 [29 L.Ed.2d 110, 91 S.Ct. 1619]; *Branzburg* v. *Pound* (Ky. 1970) 461 S.W.2d 345, cert. granted *sub nom. Branzburg* v. *Hayes,* 402 U.S. 942 [29 L.Ed.2d 109, 91 S.Ct. 1616].)

---

[5]We express no opinion on the quantum of proof required to establish that inquiry into a newsman's source is necessary to permit the court to carry out its duty to control its own officers and to restrict persons subject to its control from disseminating prejudicial pretrial publicity. Here petitioner has admitted the necessary facts. Neither do we express an opinion on the validity of Evidence Code section 1070 where a possible source of the newsman's story contrary to a *Sheppard* order is other than an attorney of record, a court attache, or the prosecutor's office.

The context of the case at bench precludes the necessity of awaiting the outcome of the three cases now before the United States Supreme Court. All involve inquiries into reporters' sources of information relevant to prosecution of criminal activity but none involves questions seeking the source of the violation of a trial court order designed to prevent prejudicial publicity as does the matter here. Existing United States Supreme Court precedent indicates that regardless of the outcome of the three cases now before that tribunal, no rule of confidentiality of source will protect the petitioner in the case at bench.

█ Freedom of the press as guaranteed by the First Amendment is not absolute but is limited by narrow compelling exceptions. (See *Zemel* v. *Rusk,* 381 U.S. 1, 16-17 [14 L.Ed.2d 179, 189-191, 85 S.Ct. 1271]; *Brandenburg* v. *Ohio,* 395 U.S. 444, 447 [23 L.Ed.2d 430, 433, 89 S.Ct. 1827]; *Bates* v. *Little Rock,* 361 U.S. 516, 524 [4 L.Ed.2d 480, 486, 80 S.Ct. 412].) That freedom exists to insure the unimpeded flow of information indispensable to the existence of a democratic society. (*Mills* v. *Alabama,* 384 U.S. 214, 218-219 [16 L.Ed.2d 484, 487-488, 86 S.Ct. 1434]; Note, *Reporters and Their Sources: The Constitutional Right to a Confidential Relationship,* 80 Yale L.J. 317, 324-325.) Where, as here, the impediment to the free flow of information is indirect by the creation of a situation in which press informants may be inhibited by the possibility that their identity will be revealed, the need for disclosure of source must be weighed to determine whether it is so compelling as to outbalance the vital interest in uninhibited flow of news. (Note, *Reporters and Their Sources: The Constitutional Right to a Confidential Relationship,* 80 Yale L.J. 317, 319-320; Note and Comment, *Privileged Communications— News Media,* 46 Ore.L.Rev. 99, 101; Comment, *Silence Orders—Preserving Political Expression by Defendants and Their Lawyers,* 6 Harv. Civ. Rights-Civ. Lib. L.Rev. 595, 597-598; Comment, *Constitutional Protection For the Newsman's Work Product,* 6 Harv. Civ. Rights-Civ. Lib. L.Rev. 119, 135.)

In the matter at bench there is an undeniable need for disclosure of source if the court is not to be thwarted in its effort to enforce its order against prejudicial publicity issued to comply with the mandate of the United States Supreme Court in *Sheppard* v. *Maxwell, supra,* 384 U.S. 333. That same mandate declares that the public interest in fair trial is so compelling as to both validate and require that in appropriate situations the public temporarily be denied access to prejudicial publicity emanating from court controllable sources. █ Since the highest court in the United States has ruled that prejudicial material from those sources may properly be kept from news media no public purpose is frustrated by com-

pelling a newsman to reveal his source of a violation of an order such as that considered here. If disclosure of the source of a violation may inhibit future violations, the inhibition serves the public purpose declared by the high court and deprives the public of only that information which that court has declared must be kept from it temporarily if the constitutional right to a fair trial is to be preserved.

Balancing, as we are required to do, the interest to be served by disclosure of source against its potential inhibition upon the free flow of information, we conclude that petitioner is not privileged by the First Amendment to refuse to answer the questions put to him in the trial court.

### *Validity of Order re Publicity*

Amici curiae contend that the order re publicity issued by the trial court is a void interference with freedom of the press. They argue that the jury was sequestered in the Manson trial and no purpose could be served by an order limiting publicity after the jury was sequestered. The issue was not raised by petitioner in the trial court and is not raised by him in his petition for review. We thus do not have before us a record adequate to deal with the contention raised by amici. We cannot determine from the information available to us what effect the release of prejudicial publicity during the course of the Manson trial might have had. We thus must reject the contention.

### *Disposition*

The order imposing judgment of contempt is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied January 12, 1972, and the opinion was modified to read as printed above. Petitioner's application for a hearing by the Supreme Court was denied March 20, 1972.