[No. H015032. Sixth Dist. July 25, 1996.]

In re BETH WILLON et al., on Habeas Corpus.

## COUNSEL

O'Donnell, Rice, Davis, Alexander & Granneman, Edward P. Davis, Jr., Judy Alexander, Suzanne A. Heinrich and James M. Chadwick for Petitioners.

Steinhart & Falconer, James F. Brelsford, Roger R. Myers and Nicole A. Wong as Amici Curiae on behalf of Petitioners.

Steven M. Woodside, County Counsel, Ann Miller Ravel, Chief Assistant County Counsel, Linda Deacon, Susan Konecny Branch and Susan Swain, Deputy County Counsel, for Real Parties in Interest.

## OPINION

ELIA, J.—In this writ proceeding, a reporter and news director of a local television station seek relief from contempt after they refused to disclose the

identity of a person who provided information about a pending criminal prosecution in violation of a protective ("gag") order. Petitioners contend that California's shield law, California Constitution article I, section 2, subdivision (b) (hereafter, article I, section (2)(b)), immunizes them from contempt under these circumstances. Respondent, the Santa Clara County Superior Court, maintains that the contempt order was necessary to deter future violations and thereby protect the defendant's right to a fair trial. We hold that the shield law protects the news media from contempt absent a specific showing that nondisclosure of the source will create a substantial probability of injury to the criminal defendant's right to a fair trial. Accordingly, we will grant petitioners' request for a writ of habeas corpus or certiorari and annul the judgment of contempt.

## Background

Petitioner Beth Willon is a news reporter for KNTV Channel 11 in San Jose. Petitioner Terrence McElhatton is the news director of KNTV. On February 14, 1996, jury selection began in the trial of Richard Allen Davis, who was accused of the kidnapping and murder of 12-year-old Polly Klaas. Polly's disappearance from her Petaluma home and the subsequent arrest of Davis had generated widespread publicity and extensive local community involvement. Although the preliminary hearing was open to the public, the Sonoma County Superior Court closed some of the pretrial proceedings and issued a protective order prohibiting court staff, participants and witnesses from discussing what had transpired at those hearings. Nevertheless, due to the magnitude of public attention to the case in Sonoma County, the court was unable to obtain an impartial jury, and eventually it granted a motion for a change of venue to Santa Clara County.

On January 10, 1996, the superior court in Santa Clara County expressed its concern that selection of an unbiased jury would be frustrated if facts were disclosed about the upcoming trial. The court observed that the case was "one of considerable public interest which may result in substantial publicity and that there is a reasonable likelihood that public dissemination by any means of extrajudicial statements relating to this case may interfere with a fair trial, and may otherwise prejudice the due administration of justice." Accordingly, the court issued another protective order which prohibited court officers, law enforcement officers and other public officials, and prospective trial witnesses from releasing to the public any evidence that had not yet been ruled admissible by the court, as well as any comments about the evidence gathered, testimony already heard or expected, and the identity of prospective witnesses. Subsequently, the trial court denied a request by representatives of the news media to make transcripts of the prior

closed hearings available to the public before a jury was seated, citing its duty to protect the defendant's right to a fair trial.

On February 14, 1996, the first day of jury selection, KNTV broadcast a report prepared by petitioner Beth Willon. During the 6 p.m. newscast, anchor Doug Moore stated, "KNTV news has learned the entire videotaped confession of accused killer Richard Allen Davis will be used as evidence in the Polly Klaas murder trial." Co-anchor Maggi Scura added, "This development comes from a source close to the investigation." Willon then related the details of the events to which Davis had confessed, as described by "a source close to the case." The "source" also told Willon that there were no witnesses to two stops the defendant had made after kidnapping Polly, and that Davis was not asked about sexual assault when his confession was taped. Willon commented that "because Polly Klaas' body was so badly decomposed, it will probably never be known if she was sexually assaulted." Scura and Willon added that most of the contents of the statement had already been made public; the new information was that the entire statement would be admitted into evidence at trial.

Later that day, during the 11 p.m. newscast, Doug Moore repeated that Davis's confession would be used as evidence in the trial. Willon again related details of the kidnapping and murder as described in Davis's statement, punctuated by introductory phrases such as "Our source says . . ." and "Our source tells us . . . ." At the conclusion of Willon's report, Moore added, "And our source says it will likely never be known if Polly Klaas was still alive when the deputies stopped Davis on Pithian Road. Along with the kidnap and murder charges, Davis is charged with lewd and lascivious conduct, but because Polly Klaas' body was so badly decomposed, it will probably never be known if she was sexually assaulted. Our source tells us there were no questions about sexual assault when Davis' confession was taped."

The following day, February 15, 1996, the trial court played a videotape of the newscasts and asked the parties to address its concern that the contents of the KNTV newscasts might have been obtained in violation of the court's protective order. The district attorney believed that all of the information reported was available from the preliminary hearing transcript and from other media coverage. The court noted, however, that several of the statements were prefaced by references to their "source close to the case." If these statements were in fact obtained from a person subject to the order, the reporter involved would have "no privilege to refuse to disclose this so-called confidential source." The court had an "obligation" to discover who had violated the protective order; otherwise, "a court order means nothing."

The court added that the timing of the broadcast "could not be worse," since jury selection had just begun; in the court's view it appeared to be an attempt to contaminate the jury pool in Santa Clara County and "ensure that the parties don't receive a fair trial."[1]

On February 21, 1996, the trial court issued subpoenas ordering petitioners to appear in court the following week. On February 28, 1996, petitioners appeared with counsel. The court commenced the hearing by stating it had a "mandatory duty" to protect defendants from the effects of prejudicial publicity "by censuring and disciplining those who violate protective orders." The court expressed "significant concerns" that the material in the KNTV newscasts was obtained from a person subject to the existing protective order, "and that this information could have the reasonable likelihood of tainting the potential jurors and depriving this defendant of his right to a fair trial."

The court identified several statements by KNTV that it believed were derived from material encompassed within the protective order: (1) the announcement that the defendant's confession would be used as evidence at trial; (2) the narration of Davis's confession in detail; (3) the statement that there were no witnesses to either of the stops Davis made after kidnapping Polly; (4) the statement that Davis was not asked about sexual assault when his confession was taped; and (5) the comment that the body was so badly decomposed it probably will never be known if she was sexually assaulted.

Each of these statements, the court found, was a violation of the previous orders sealing records and prohibiting comment or disclosure regarding the case. The court emphasized the importance of ascertaining who had violated its protective orders, not only to punish the violation, but "to ensure that no future violations occur." The court reminded the parties that "[t]he need to prevent the dissemination of prejudicial publicity during jury selection is not only paramount, but goes to the heart of the right of this defendant to receive a fair trial in Santa Clara County." In the court's view, "this is exactly the type of prejudicial pre-trial publicity which taints the jury pools."

The trial court recognized the protection afforded news reporters under article I, section (2)(b), but it opined that the protection was of a limited immunity which was outweighed by the defendant's right to a fair trial. In order to protect that right, the court reasoned, it was "both bound and

---

[1] That evening, KNTV's 5 p.m. and 6 p.m. newscasts contained a story about the hearing, including the court's remarks on the record and comments by the prosecutor, defense attorney, and petitioner McElhatton. The report did not recount or elaborate on the details of the previous day's newscasts.

empowered" to explore the violations of the protective order as an exercise of its "preeminent federal constitutionally compelled duty to control its own officers," and thereby to forestall additional pretrial publicity. The court also found that questioning up to 1,500 individuals who were subject to the order would entail a needless delay of the trial and therefore was "not a reasonable alternative."

Through county counsel the trial court proceeded to question petitioners individually regarding the identity of their source. On each occasion the court admonished them that the question was "constitutionally permissible" and ordered them to answer. To every question but one, petitioners declined to answer, citing the shield law and the First Amendment of the federal Constitution. Petitioners did respond when county counsel asked whether they had promised confidentiality to the source; Willon had made such a promise, and McElhatton had not.

At the conclusion of the hearing the trial court informed petitioners that they were being cited for contempt, based on the following findings: "You have been informed that the qualified immunity set forth in Evidence Code section 1070 and the California Constitution, Article One, Section 2(b), does not apply to the circumstances before the court in which the court has a duty to determine those individuals who have violated the court's protective order in order to ensure the defendant's right to a fair trial." The court observed that petitioners had the ability to comply with the order but "chose not to do so." Accordingly, the court found petitioners to be in direct contempt within the meaning of Code of Civil Procedure section 1209, subdivision (a)5 and (a)9, and ordered them imprisoned until they agreed to answer the court's questions. At the request of petitioners' counsel, the court granted a five-day stay until Monday, March 4, 1996.

On February 29, 1996, petitioners applied in this court for a temporary stay of execution of the trial court's contempt order. On March 1, this court granted a temporary stay of execution, and granted petitioners 10 days to file a formal petition for review. On March 29, 1996, after receiving the petition, opposition, and an amicus curiae brief from various media representatives, we issued an order directing the trial court to show cause for denial of the requested relief.[2]

---

[2]Petitioners and the trial court both acknowledge that subsequent to the contempt order, a jury was selected and trial proceeded. Consequently, petitioners argue, the purpose of the contempt order would no longer be served. Neither party, however, suggests that this proceeding should be dismissed as moot. The court still seeks to punish petitioners in order to prevent further prejudicial publicity, and petitioners continue to challenge the validity of the order. Even if the trial court were to withdraw its decision to punish petitioners, this case

*Discussion*

## 1. *Standard of Review*

■ The standard of this court's review is governed by established principles. The question before us is whether the trial court had jurisdiction to impose the contempt order. We examine the entire record to determine whether there is substantial evidence to sustain the order. (*In re Buckley* (1973) 10 Cal.3d 237, 247 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248]; *Mitchell* v. *Superior Court* (1989) 49 Cal.3d 1230, 1256 [265 Cal.Rptr. 144, 783 P.2d 731].) In this case, the trial court punished petitioners for direct contempt, since their refusal to answer questions occurred in the court's immediate presence. A direct contempt order may be punished summarily, but the court must state the facts on which it is based with sufficient particularity to demonstrate on its face, without the aid of speculation, that petitioner's conduct constituted a legal contempt. (*Ibid.*; *McCann* v. *Municipal Court* (1990) 221 Cal.App.3d 527, 536 [270 Cal.Rptr. 640].) Although the power to weigh evidence is solely that of the trial court, the reviewing court does not presume in support of the contempt order. (*McCann* v. *Municipal Court, supra,* 221 Cal.App.3d at p. 537.) If the record of the proceedings fails to demonstrate on its face the existence of all the necessary facts upon which jurisdiction depended, the contempt order cannot be sustained. (*Mitchell* v. *Superior Court, supra,* 49 Cal.3d at p. 1256.)

There is no dispute about the facts underlying the contempt order in this case. Petitioners refused to answer questions about the identity of the person on whom they apparently relied in gathering information for their broadcasts about Davis's trial. ■ The trial court's conclusion that petitioners' refusal to disclose their source was a sufficient ground for contempt was based on the court's concern that future violations of its protective order would taint the jury pool and thus preclude a trial by an impartial jury. This determination presents a mixed question of law and fact which is subject to independent appellate review. (*People* v. *Louis* (1986) 42 Cal.3d 969, 984 [232 Cal.Rptr. 110, 728 P.2d 180]; cf. *People* v. *Sanders* (1995) 11 Cal.4th 475, 506 [46 Cal.Rptr.2d 751, 905 P.2d 420] [in motions for change of

would not be moot, since it presents important public issues that are "capable of repetition, yet evading review." (*Gannett Co.* v. *DePasquale* (1979) 443 U.S. 368, 377-378 [61 L.Ed.2d 608, 619-621, 99 S.Ct. 2898]; *Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596, 603 [73 L.Ed.2d 248, 254-255, 102 S.Ct. 2613]; *Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 546-547 [49 L.Ed.2d 683, 690-691, 96 S.Ct. 2791].) Moreover, the controversy is of short duration so as to preclude normal appellate review. (Cf. *Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S. 1, 6 [92 L.Ed.2d 1, 8-9, 106 S.Ct. 2735]; *San Jose Mercury-News* v. *Municipal Court* (1982) 30 Cal.3d 498, 501, fn. 2 [179 Cal.Rptr. 772, 638 P.2d 655].)

venue, reasonable likelihood of a fair and impartial trial is mixed question of law and fact, reviewed de novo].) Before we can make this determination, however, we must address the overarching question of what showing is necessary to override the constitutional protection of article I, section 2(b) and compel disclosure of news sources during a pending criminal proceeding.

### 2. *Application of the Shield Law*

California's shield law has been in existence since 1935, when it was added to Code of Civil Procedure section 1881 as subdivision 6. (Stats 1935, ch. 532, § 1, p. 1608.)[3] Over the next 40 years the statute was amended numerous times. In 1961 the Legislature expanded the class of protected individuals beyond those connected with newspapers to persons associated with magazines, television, radio, and wire services. In 1965, the Legislature incorporated the shield into the newly adopted Evidence Code, where it was enacted as section 1070. (Stats. 1965, ch. 299, § 2, p. 1335.) Evidence Code section 1070 (hereafter, section 1070) was amended several more times, most notably in 1974, when the Legislature added a protection for the refusal to disclose unpublished information. (Stats. 1974, ch. 1323, § 1, p. 2877; ch. 1456, § 2, p. 3184.)

The most significant development in the evolution of California's shield law took place in 1980, when the voters passed Proposition 5, thereby incorporating the shield law into the state Constitution. In language nearly identical to section 1070, article I, section (2)(b) provides that persons currently or formerly employed in the news media "shall not be adjudged in contempt" for refusing to disclose either (1) the source of information obtained while associated with the newsgathering organization, or (2) materials such as notes, photographs, or tapes acquired or prepared in gathering news, but not disseminated to the public.[4] Thus, the newsperson is immune from contempt for refusing to disclose either unpublished information,

---

[3]Code of Civil Procedure section 1881 codified the policy "to encourage confidence and to preserve it inviolate." Subdivision 6 provided: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper can not be adjudged in contempt by a court, the Legislature, or any administrative body, for refusing to disclose the source of any information procured for publication and published in a newspaper."

[4]The full text of this provision states: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, shall not be adjudged in contempt by a judicial, legislative, or administrative body, or any other body having the power to issue subpoenas, for refusing to disclose the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for

whether confidential or nonconfidential, or the source of information, whether published or unpublished. (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 796-797 [268 Cal.Rptr. 753, 789 P.2d 934].) The intent of the voters, as indicated by the ballot argument for Proposition 5, was to safeguard the free flow of information from the news media to the public, "one of the most fundamental cornerstones assuring freedom in America." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 3, 1980) p. 19.)

■ Although the protection afforded by section 1070 and article I, section 2(b), is often referred to as a privilege, the Legislature and the Supreme Court have emphasized that it provides only an immunity, not a privilege. (Assem. Committee on Judiciary com., Evid. Code, § 1070; *Delaney* v. *Superior Court, supra*, 50 Cal.3d at p. 797, fn. 6, and cases cited therein.) Consequently, other sanctions are not precluded, at least in civil actions against the newsperson. (*KSDO* v. *Superior Court* (1982) 136 Cal.App.3d 375, 379-380 [186 Cal.Rptr. 211]; *Playboy Enterprises, Inc.* v. *Superior Court* (1984) 154 Cal.App.3d 14, 26 [201 Cal.Rptr. 207]; see also *New York Times Co.* v. *Superior Court* (1990) 51 Cal.3d 453, 463-464 [273 Cal.Rptr. 98, 796 P.2d 811].) Nevertheless, "[s]ince contempt is generally the only effective remedy against a *nonparty* witness, the California enactments grant such witnesses virtually absolute protection against compelled disclosure." (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 274 [208 Cal.Rptr. 152, 690 P.2d 625].)

■ On its face, article I, section 2(b) does appear to provide absolute protection to those engaged in the newsgathering process; it is couched in clear mandatory language without qualification. Indeed, in civil proceedings the provision has been construed to provide "the highest possible level of protection" from disclosure of materials sought by a civil litigant. (*Playboy Enterprises, Inc.* v. *Superior Court, supra*, 154 Cal.App.3d at p. 27-28; *Mitchell* v. *Superior Court, supra*, 37 Cal.3d at p. 274; *New York Times Co.* v. *Superior Court, supra*, 51 Cal.3d 453, 456.)

communication to the public. [¶] Nor shall a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public. [¶] As used in this subdivision, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated." (Art. I, § 2(b)).

In the context of criminal proceedings, however, it is settled that the protection "must yield to a criminal defendant's constitutional right to a fair trial when the newsperson's refusal to disclose information would unduly infringe on that right." (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 793; *People* v. *Cooper* (1991) 53 Cal.3d 771, 820 [281 Cal.Rptr. 90, 809 P.2d 865].) Even if we were considering petitioners' federal First Amendment rights rather than a state constitutional interest, we would regard the defendant's Sixth Amendment right as preeminent.[5] "No right ranks higher than the right of the accused to a fair trial." (*Press-Enterprise Co.* v. *Superior Court* (1984) 464 U.S. 501, 508 [78 L.Ed.2d 629, 637, 104 S.Ct. 819] (*Press-Enterprise I*); see also *Gentile* v. *State Bar of Nevada* (1991) 501 U.S. 1030, 1075 [115 L.Ed.2d 888, 923, 111 S.Ct. 2720] ["Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right."].)

 Petitioners contend that their immunity under the shield law is absolute unless disclosure is shown to be necessary to protect the defendant's fair trial rights. The trial court appears to take the position that any measures it takes to control prejudicial publicity safeguard the defendant's fair trial rights. Its contempt ruling was such a measure, implemented with the goal of preventing future violations of its protective order. Consequently, any competing interests "automatically" are subordinated.

As thus framed, the present controversy does not call for a weighing of petitioners' state constitutional interests against Davis's constitutional right to a fair trial; both parties agree that when these interests are in conflict, the criminal defendant's fair trial right prevails. Rather, our focus is on a precursory determination: what showing is required to demonstrate that a defendant's fair trial rights are threatened by a newsperson's refusal to disclose information protected by article I, section 2(b)?

 It was initially petitioners' burden to show that they were in a class of persons protected by the shield law, and that the information provided by

---

[5]Courts traditionally have based an examination of the effects of pretrial publicity on the Sixth Amendment, which entitles the accused to "a speedy and public trial, by an *impartial* jury . . . ." (U.S. Const. 6th Amend.; *Turner* v. *Louisiana* (1965) 379 U.S. 466, 472 [13 L.Ed.2d 424, 428-429, 85 S.Ct. 546].) It is also appropriate to invoke the due process clause of the Fourteenth Amendment, which guarantees a "fair trial by a panel of impartial, 'indifferent' jurors," whose verdict is based solely on the evidence developed at trial. (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 722 [6 L.Ed.2d 751, 755, 81 S.Ct. 1639]; *Turner* v. *Louisiana, supra,* 379 U.S. at p. 471 [13 L.Ed.2d at p. 428]; see also *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507] [due process requires a trial "by an impartial jury free from outside influences."]; cf. *Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 806, fn. 18 [defendant's right to pretrial discovery governed by Fourteenth Amendment].)

their source was "procured . . . for news or news commentary purposes on radio or television. . . ." (Art. I, § 2(b); cf. *Delaney* v. *Superior Court, supra*, 50 Cal.3d at p. 805, fn. 17; *People* v. *Sanchez* (1995) 12 Cal.4th 1, 55 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) There is no question that they made this prima facie showing. If the defendant were seeking disclosure, it would then be his burden to show a reasonable possibility that the information sought would materially assist his defense. (*Delaney* v. *Superior Court, supra*, 50 Cal.3d at p. 808.) After the defendant satisfied this threshold requirement, the trial court would then balance the respective interests of the defendant and the newsperson, considering factors outlined in *Delaney*. (*Id.* at pp. 810-814.)

This test, however, is inapplicable here. Unlike *Delaney*, we are not confronted with a request by a defendant for information that would directly assist in his or her defense;[6] here it is the trial court that seeks disclosure in order to preserve its ability to control the judicial process and maintain an unbiased jury pool. Furthermore, petitioners have not been ordered to testify as observers of a public event, as were the reporters in *Delaney*, but as holders of confidential information respecting the identity of their news source. We thus agree with the parties that the threshold showing and balancing test formulated in *Delaney* are not controlling here.

 The trial court maintains that petitioners' testimony is compelled by the need to prevent the further spread of prejudicial pretrial publicity. The court relies on *Sheppard* v. *Maxwell, supra*, 384 U.S. 333, which imposed on trial courts an affirmative duty to control adverse publicity to protect the right of an accused to a fair trial. The court also cites *Farr* v. *Superior Court* (1971) 22 Cal.App.3d 60 [99 Cal.Rptr. 342], and *Rosato* v. *Superior Court* (1975) 51 Cal.App.3d 190 [124 Cal.Rptr. 427], which examined this duty in relation to the shield law before its incorporation into the California Constitution. Each of these cases, however, is distinguishable in an important respect.

In *Sheppard*, extreme publicity surrounded the defendant's trial, including inflammatory material that reached the jurors but was not admitted into evidence. The trial judge failed to extinguish the "carnival atmosphere" created by the disruptive presence of the news media in court and their ongoing commentary on the proceedings. (384 U.S. at p. 358 [16 L.Ed.2d at pp. 617-618.) The United States Supreme Court emphasized that due process

---

[6]*Delaney* arose from a pat-search witnessed by two reporters during which the police recovered brass knuckles from the defendant's pocket. At the suppression hearing the reporters refused to answer questions directed at the ultimate issue of whether the defendant had consented to the pat-search.

requires that the accused receive a trial by an impartial jury free from outside influences. Since the trial judge did not protect the defendant from the prejudicial publicity which "saturated" the community and disrupted the courtroom, the defendant was entitled to a writ of habeas corpus. (*Id.* at p. 363 [16 L.Ed.2d at pp. 620-621].)

█ As the trial court observes, *Sheppard* clearly obligates the trial court to undertake measures to control publicity when, under the totality of the circumstances, the court finds that such exposure is reasonably likely to impair the criminal defendant's constitutional right to a fair trial. The trial judge in that case could have avoided the prejudice to defendant's rights if he had regulated the presence and conduct of the news media, insulated witnesses from press access, and controlled the dissemination of information about the case from public officials and participants in the proceedings. But the *Sheppard* court had no occasion to consider whether control of prejudicial publicity extends to compelling a newsperson to disclose the identity of or information received from a news source. Thus, *Sheppard* offers little guidance in determining when a newsperson's constitutional immunity from contempt must give way to the right of a criminal defendant to a fair trial.

In *Farr* v. *Superior Court, supra,* 22 Cal.App.3d 60, a newspaper published a story on a notorious murder trial, that of Charles Manson and his codefendants. Petitioner Farr's story was derived from a written statement of a prospective witness, describing a confession by one of the codefendants. The codefendant not only admitted committing the charged crimes along with Manson and others, but also related the lurid details of the defendants' intended torture and murders of certain celebrity victims. Farr had obtained a copy of the witness's statement from persons who had been subject to a protective order barring release of any evidence the court had not yet ruled admissible. Much of the material in the statement was excluded from evidence. The trial court sought disclosure of the identity of whoever had given the reporter a copy of the statement, but Farr refused, asserting the immunity accorded him under section 1070. The trial court found Farr in direct contempt.

The appellate court affirmed. To construe section 1070 as granting Farr immunity, the court reasoned, would violate the principle of separation of powers by "severely impair[ing] the trial court's discharge of a constitutionally compelled duty to control its own officers." (22 Cal.App.3d at p. 70.) When the protective order was violated, the trial court retained the power and obligation to enforce the order by compelling disclosure of Farr's source. The appellate court did not require a preliminary showing that the defendants' right to a fair trial was actually threatened.

While the underlying facts are similar, the rationale of the *Farr* court's holding is inapplicable to cases decided after the adoption of the amendment to article I, section 2. ██ By elevating the statutory immunity provided in section 1070 to constitutional status, the voters evidently intended to require judges " 'to give the protection greater weight before attempting to compel reporters to breach their pledges of confidentiality.' " (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 802, fn. 13, quoting ballot argument in support of proposed amendment.) It is no longer appropriate to rely on the separation of powers doctrine to accord primacy to a judge's control of court processes.

The second holding of the court in *Farr* v. *Superior Court, supra,* 22 Cal.App.3d 60, is more relevant to an analysis of competing constitutional interests. Focusing on the reporter's First Amendment rights, the court held that "the need for disclosure of source must be weighed to determine whether it is so compelling as to outbalance the vital interest in [the] uninhibited flow of news." (*Id.* at p. 72.) The court did not, however, engage in such a balancing of interests, but presumed that there was "an undeniable need for disclosure" to preserve the trial court's ability to enforce its order against prejudicial publicity. (*Id.* at p. 72.)[7]

We believe this conclusory reasoning only begs the question of whether disclosure is necessary to protect the defendant's right to a fair trial. If the need for disclosure were presumed in every case without an examination of the underlying facts, the immunity would lose its vitality. Since the elevation of the statutory protection to constitutional status, it is even more important that the court determine the likelihood of injury to a criminal defendant's constitutional rights before concluding that disclosure of sources or unpublished information is necessary.

In *Rosato* v. *Superior Court, supra,* 51 Cal.App.3d 190, the Fifth District undertook an analysis consonant with that of the *Farr* court. In that case two reporters and their editors were adjudged in contempt for refusing to disclose the identity of the person who had released the contents of a sealed grand jury transcript in violation of a protective order. The court agreed with *Farr* in concluding that the court had a broad power to investigate violations of its

---

[7]The Ninth Circuit Court of Appeals reached a similar conclusion upon Farr's petition for habeas corpus relief in federal court. The court "accepted factually that the ostensible purpose" of the contempt order was to protect the Manson defendants' right to a fair trial, "free of prejudicial publicity." (*Farr* v. *Pitchess* (9th Cir. 1975) 522 F.2d 464, 467.) The court held that "on the facts presented" (*id.* at p. 468), the duty to protect the defendants' due process right outweighed the reporter's First Amendment protection. Although the court stated that the competing interests must be weighed "in light of the surrounding facts" (*ibid.*), the court did not specify what facts in the record compelled the conclusion that the defendants would not receive a fair trial if Farr's source were not revealed.

protective and seal orders, justified by the need to assure the defendants a fair trial. That power included compelling disclosure of the identity of a news source who was subject to those orders. (*Id.* at pp. 222-224.)

Although the *Rosato* court appeared to adopt the view that a trial court's power to control judicial proceedings invariably prevails over the newsperson's statutory immunity, it did not completely ignore the facts demonstrating prejudice to the defendants. The court's preliminary holding that the protective orders were necessary to avert prejudicial publicity was based on evidence of potential injury to the defendant's fair trial rights. The court reviewed the published articles, noting that much of the information reported was not only highly prejudicial to the defendant but also questionable as to its admissibility. The court accordingly concluded that at the time of the protective and seal orders *and* at the time of publication, there was a "reasonable likelihood" that publication of the grand jury transcript would endanger the defendant's right to a fair trial by making it difficult to impanel an unbiased jury. (51 Cal.App.3d at p. 209.)[8]

The *Rosato* court also considered the petitioners' First Amendment rights in light of the trial court's duty to protect the defendant's right to a fair trial. After balancing these two competing interests based on its independent review of the record, the court concluded that under the circumstances presented, the defendant's right to a fair trial outweighed petitioners' federal constitutional right to refuse to disclose their sources.

The trial court insists that *Farr* and *Rosato* continue to be controlling notwithstanding the elevation of the reporter's immunity to state constitutional status. The court emphasizes, as it did in the contempt hearing, that the need to protect Davis's constitutional right to a fair trial outweighs the immunity under the shield law, whether that immunity is of statutory or constitutional origin. But this assertion only restates the obvious. ▮ Petitioners do not disagree that the right of an accused to a fair trial is paramount; what they contest is the assumption that a source's violation of protective orders is by itself a sufficient basis to compel disclosure of protected information.

Petitioners' argument is well taken. Article I, section 2(b) offers no real protection if it can be overridden merely by a conclusive presumption that

---

[8]In *Press-Enterprise* v. *Superior Court* (1994) 22 Cal.App.4th 498, 503-504 [27 Cal.Rptr.2d 708], the Fourth District, Division Two, considered the possibility that a "reasonable likelihood" standard may be inadequate to protect the public's right of access to pretrial proceedings. Acknowledging the United States Supreme Court's holding in *Press-Enterprise Co.* v. *Superior Court, supra,* 478 U.S. 1 (*Press Enterprise II*), the court applied both a "reasonable likelihood" and a "substantial probability" standard to the determination of whether release of a grand jury transcript would impair the ability to secure an impartial jury.

nondisclosure will be harmful to the accused. "[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." (*Nebraska Press Assn.* v. *Stuart, supra,* 427 U.S. at p. 565 [49 L.Ed.2d at p. 701].) Nor is it sufficient to state, as did the trial court here, that the newsperson had the ability to answer the court's questions and refused to do so. In our view, a newsperson should not be held in contempt for refusing to disclose news sources or unpublished information absent specific findings demonstrating that disclosure of the information sought is necessary to avert an actual threat to the defendant's right to a fair trial.

This conclusion, however, calls for more precise guidelines. By what standard should the underlying facts be examined to determine whether disclosure is necessary to avoid prejudice to defendant? Furthermore, what criteria should guide a trial court's application of that standard?[9]

In *Sheppard* v. *Maxwell, supra,* 384 U.S. 333, the United States Supreme Court used a "reasonable likelihood" test for determining the necessity of measures to guard against prejudicial publicity. Accordingly, where there is a "reasonable likelihood that prejudicial news prior to trial will prevent a fair trial," a trial judge must take whatever steps are necessary to protect the proceedings from such interference. (*Id.* at p. 363 [16 L.Ed.2d at pp. 620-621].) Similarly, Penal Code section 1033 requires the court to grant a motion for change of venue "when it appears that there is a *reasonable likelihood* that a fair and impartial trial cannot be had in the county." (Pen. Code, § 1033, italics added.) Appellate courts of this state also use this standard in ascertaining the effect of certain trial court errors; those errors will be considered prejudicial only if it is "reasonably probable" that a result more favorable to the defendant would have been reached absent the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

We believe this standard is inadequate to preserve the newsperson's constitutional immunity under article I, section 2(b). ▮ The "reasonable

---

[9]In his concurring opinion, our colleague suggests that articulation of such a standard will only impose an unnecessary burden on trial courts confronting unique facts. He would limit our holding to the conclusion that the trial court erred in failing to hold a hearing to determine whether the defendant's fair trial rights were jeopardized. The trial court did conduct such a hearing, however, and even attempted to balance petitioners' rights under the shield law against Davis's right to a fair trial. Nevertheless, without the benefit of a distinct standard for measuring the gravity of the threat to Davis's trial rights, the court merely presumed that these rights were in jeopardy, thus overriding petitioners' shield law protection.

We believe it would be a disservice to trial courts *not* to provide further guidance. The ultimate task facing the trial court is not merely to decide whether the defendant's fair trial rights are in jeopardy, but to determine whether the threat is serious enough to override the protection of the shield law and require disclosure of the news source. Not to define some standard by which to evaluate that necessity in each case would only leave trial courts adrift in a sea of conflicting constitutional principles.

probability" test generally imparts a meaning greater than "merely possible," but less than "more likely than not." (*People* v. *Bonin* (1988) 46 Cal.3d 659, 673 [250 Cal.Rptr. 687, 758 P.2d 1217]; *College Hospital, Inc.* v. *Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894] [term "probability" in the *Watson* test means "merely a reasonable chance, more than an abstract possibility"]; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 693, 694 [80 L.Ed.2d 674, 697, 697-698, 104 S.Ct. 2052] [to establish reasonable probability of prejudice arising from ineffective assistance of counsel, defendant need not show counsel's deficient performance "more likely than not" altered result, but only probability "sufficient to undermine confidence in the outcome."].) Here, however, the defendant's right to a fair trial must be considered not in isolation but in relation to a competing constitutional interest, albeit a subordinate one. In such cases a stronger showing than a reasonable likelihood of prejudice should be required to overcome the protection of the shield law.

Petitioners advocate a "substantial probability" test, a more demanding level of scrutiny than the "reasonable likelihood" test. (*Press-Enterprise II, supra,* 478 U.S. at p. 14 [92 L.Ed.2d at pp. 13-14]; *Press-Enterprise* v. *Superior Court, supra,* 22 Cal.App.4th 498; *People* v. *Clair* (1992) 2 Cal.4th 629, 668 [7 Cal.Rptr.2d 564, 828 P.2d 705].) ▮▮▮ This is the same standard used to review judicial restrictions on public access to criminal proceedings. Jury voir dire, preliminary examination, and trial must remain open absent specific, express findings demonstrating that exclusion of the public "is essential to preserve higher values and is narrowly tailored to serve that interest." (*Press-Enterprise I, supra,* 464 U.S. 501, 510 [78 L.Ed.2d 629, 638]; *Globe Newspaper Co.* v. *Superior Court, supra,* 457 U.S. 596, 607 [73 L.Ed.2d 248, 257-258]; *Press-Enterprise II, supra,* 478 U.S. 1, 13-14 [92 L.Ed.2d 1, 13-14].) If the interest asserted is the right of the accused to a fair trial, the preliminary hearing may be closed "only if specific findings are made demonstrating that, first, there is a *substantial probability* that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." (*Press-Enterprise II, supra,* 478 U.S. at p. 14 [92 L.Ed.2d at pp. 13-14], italics added.)

The "substantial probability" test has been applied in a variety of procedural contexts in which a defendant's right to a fair trial is the dominant interest to be protected, even when no competing individual interests are involved. For example, an attorney's commentary on the pending criminal trial of his or her client may be limited if it is "substantially likely to have a materially prejudicial effect" on the trial. (*Gentile* v. *State Bar of Nevada,*

*supra*, 501 U.S. at p. 1076 [115 L.Ed.2d at pp. 924].) A pretrial identification procedure will be said to violate the due process rights of the accused if it is so suggestive as to create a " ' "very substantial likelihood of irreparable misidentification." ' " (*People* v. *Sanders* (1990) 51 Cal.3d 471, 508 [273 Cal.Rptr. 537, 797 P.2d 561]; *Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *People* v. *Brandon* (1995) 32 Cal.App.4th 1033, 1051 [38 Cal.Rptr.2d 751].) A rebuttable presumption of prejudice arising from juror misconduct may be established when there is a "substantial likelihood" that at least one juror was influenced by exposure to extrajudicial matter relating to the defendant or to the case. (*In re Malone* (1996) 12 Cal.4th 935, 964 [50 Cal.Rptr.2d 281, 911 P.2d 468]; *People* v. *Marshall* (1990) 50 Cal.3d 907, 950-951 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1109 [269 Cal.Rptr. 530, 790 P.2d 1327].) Whether exposure to extrajudicial information was "substantially likely" to create juror bias may be found either when the material is "inherently and substantially likely to have influenced the juror" or, based on the totality of the circumstances, "it is substantially likely the juror was actually biased against the defendant." (*In re Carpenter* (1995) 9 Cal.4th 634, 653-654 [38 Cal.Rptr.2d 665, 889 P.2d 985]; *People* v. *Von Villas* (1995) 36 Cal.App.4th 1425, 1431 [43 Cal.Rptr.2d 233].) In either case, the likelihood of bias "must be *substantial.*" (*In re Carpenter, supra*, 9 Cal.4th at p. 654.)

We believe that a substantial probability standard both protects the defendant's fair trial rights and recognizes the importance of the immunity conferred by article I, section 2(b). Accordingly, where a violation of a protective or "gag" order has already occurred, a court should determine the necessity of disclosure of the newsperson's source by addressing two principal considerations in light of all the relevant circumstances: (1) If the newsperson does not disclose the identity of the source, is there a substantial probability of future violations, or "leaks," that will impair the defendant's ability to obtain a fair trial? and (2) Are there reasonable alternatives to disclosure that will protect the interests asserted by both the newsperson and the defendant?

The first inquiry suggests two secondary questions: (a) is there any indication that further leaks are likely to occur; and (b) will those leaks, if published, make it impossible to obtain an impartial jury in the chosen venue? Factors relevant to these determinations include the nature and extent of the publicity, the amount of information already in the public domain, the existence of prejudicial information not yet released to the public, the size of the county from which prospective jurors will be drawn, and the potential of voir dire or other measures to eliminate any prejudice caused by the publicity.

The second inquiry entails consideration of the feasibility of alternative methods of obtaining the information and the confidentiality or sensitivity of the information. Disclosure of confidential or sensitive information is more likely to have a significant effect on the newsperson's future ability to gather news, the protection of which is the primary purpose of the shield law. (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 810.) By the same token, the importance of finding alternatives to disclosure is diminished where the identity of the source is not confidential, since "[t]he obvious purpose of the alternative-source requirement is to protect against unnecessary disclosure of a newsperson's confidential or sensitive information." (*Id.* at pp. 811-812.)

■■■ We initially consider the facts pertaining to the first inquiry—whether there is a substantial probability that failure to identify petitioners' source will facilitate additional leaks that will jeopardize the fairness of Davis's trial. As noted earlier, this is a mixed question of law and fact subject to our independent judgment. We enter into this analysis keeping in mind that assessing the likely effect of an event by its nature calls for speculation. (See *People* v. *Cooper, supra,* 53 Cal.3d 771, 839; see also *Nebraska Press Assn.* v. *Stuart, supra,* 427 U.S. at p. 563 [49 L.Ed.2d at p. 700] [finding that publicity could affect prospective jurors was necessarily speculative, since it dealt with "factors unknown and unknowable."].)

At the beginning of the contempt hearing the trial court stated that the KNTV newscasts "could have the reasonable likelihood of tainting the potential jurors." In its written contempt order, the court found that the dissemination of information subject to the protective order "poses a substantial likelihood of interfering with the defendant's basic constitutional right to a fair trial." This finding is predicated on the assumptions that unless petitioners disclose their source, future leaks will occur, and those leaks will prejudicially influence prospective jurors in Santa Clara County.

There is no evidence to support these assumptions. Although publicity surrounding this case was high, much of that attention had already resulted in the public's awareness of the salient details of the crime and Davis's participation in it. Davis's confession to the kidnapping and murder, for example, had been reported by several of the news media. Moreover, the details of the confession were revealed during the preliminary examination through the testimony of police sergeant Michael Meese, who had obtained the confession during his interrogation of Davis. The news that the confession would be admitted at trial added little to the public's knowledge of the case. If the court had ruled the confession inadmissible, or if Davis had retracted his statements before trial, we would be more inclined to view the release of information regarding the confession as potentially harmful. But

in this situation, any impact on the community caused by the admissibility ruling would be alleviated by asking questions at voir dire regarding the effect of a confession on the prospective jurors' ability to be fair and impartial.

In addition to the details of the confession and the admissibility ruling, the trial court expressed disapproval of the source's alleged statements that there were no witnesses to either of the stops Davis made after kidnapping Polly and that the videotaped interview did not include questions about sexual assault. The only inference the court drew from these statements, however, was that they were made in violation of the protective order. The court did not suggest, nor do we perceive, any prejudice that could result from these statements. Viewed in the context of the entire newscast, which related the salient details of the crime and the recovery of the victim's body, these two points pertaining to the *absence* of evidence appear relatively insignificant.

Finally, the court took exception to the KNTV comment that "because Polly Klaas' body was so badly decomposed, it will probably never be known if she was sexually assaulted." Although this statement was not directly attributed to the source, the court found that it "purports to report information that could only be known to persons subject to the court's protective and seal orders." We disagree. At the preliminary hearing, which was open to the public, the prosecution examined Jay Chapman, the forensic pathologist, regarding the condition of the victim's body. During Dr. Chapman's testimony the public learned that the decomposition of the body precluded medical conclusions regarding sexual abuse.[10] Furthermore, like the two statements discussed above, this one pertained to the absence of evidence, not a matter excluded from evidence. Any anticipated effect this information might have on selection of an impartial jury could be controlled by appropriate voir dire questions eliciting the prospective jurors' reactions to learning about a decomposed body.

---

[10]Dr. Chapman testified that the body was "extensively decomposed." An autopsy was performed "as much as we could," but "the normal [examination] procedure in this case was greatly altered because of the condition of the body. The body was severely decomposed and, actually, partially skeletonized. . . . [¶] All of the internal organs, including the internal genitalia, the pelvic organs, were completely absent, as well. They were totally decomposed. There were no remnants of them present at all in the body." The trial court asked more specifically about evidence of sexual abuse: "[I]n light of the state of the body, were you able to make any findings, one way or the other, with regards [sic] to sexual abuse? [¶] [THE WITNESS]: No. The outer areas of the tissues in the buttocks area, the perineum, the area around the genitalia and the external genitalia, as well as the internal genitalia organs, were totally absent, partially by animal activity, and primarily by decomposition changes."

In each of these instances of concern to the trial court, the material reported by KNTV was already in the public domain, of minimal significance to the case, or remediable by effective voir dire. evidence that Santa Clara County was permeated by prejudicial views regarding the crime, or that the KNTV newscast was heard by a large portion of the community. Thus, even assuming that petitioners obtained information for the newscasts from their source, we see no substantial or even reasonable probability that the source's violation would have influenced the entire jury pool. Since the record does not indicate that there is additional evidence that the court sought to withhold from the public pending jury selection, we have no basis for finding a substantial likelihood of any future violations of the protective order that would create impermissible juror bias.

We therefore conclude there are insufficient grounds for finding a substantial probability of prejudice from nondisclosure of petitioners' source. Since disclosure has not been shown to be necessary to assure Davis a fair trial under this first step of the inquiry, we need not address the second question, whether there are reasonable alternatives to compelled disclosure.[11] We also need not discuss petitioners' claim of protection under the First Amendment, their argument that the court violated their due process right to notice and an opportunity to be heard, or the contention of amicus curiae that the gag order was unconstitutionally overbroad.

### Disposition

Let a writ of certiorari issue annulling the judgments of contempt. The temporary stay shall remain in effect until this judgment is final.

Wunderlich, J., concurred.

**PREMO, Acting P. J.**—I concur in the judgment. I write separately, however, because I do not believe this case requires us to set down a yardstick rule for future hearings.

We are all in agreement that defendant's fair trial rights cannot be prejudiced by publicity, whether leaked against a judge's order, or otherwise in the normal course of events.

We are agreed that the trial court's duty is to hold a hearing whenever necessary to ascertain whether a fair trial is jeopardized. Since that did not

---

[11]We do note, however, that the court examined the availability of reasonable alternatives and determined that there were none. We accept the court's finding that interviewing everyone who was subject to the protective order would be "impractical and nearly impossible."

take place in this case we correctly nullify the contempt finding. We need go no further in this writ proceeding.

This court should not enter the legal thicket of creating a bright-line test for such similar hearings in the future. The debate over "substantial probability" or "reasonable likelihood" is one that will always be heavily nuanced by the unique facts of each case. We are here visiting extra work on trial courts in high publicity cases which often may result in the proverbial exercise of fitting a square peg into a round hole. I would defer to the Supreme Court, which is in a position to decide this matter definitively.

A petition for a rehearing was denied August 13, 1996, and petitioners' application for review by the Supreme Court was denied November 20, 1996.