956 A.2d 937

**Randall A. CASTELLANI and Joseph J. Corcoran, Appellants**

v.

**The SCRANTON TIMES, L.P., t/d/b/a the Scranton Times and the Tribune, and Jennifer Henn, Appellees.**

Supreme Court of Pennsylvania.

Argued April 16, 2008.

Decided Sept. 24, 2008.

284

286

Stephen R. Kurens, Richard A. Sprague, Sprague & Sprague, Philadelphia; Lawrence J. Moran, Abrahamsen, Moran & Canaboy, P.C., Scranton; Thomas A. Sprague, Geoffrey Richard Johnson, Sheldon L. Albert, Sprague & Sprague, Philadelphia, for R. Castellani and J. Corcoran, appellants

Kim M. Watterson, Kevin Charles Abbott, Walter Thomas McGough, Jr., Reed Smith, LLP, Pittsburgh; John Timothy Hinton, Jr., Haggerty, McDonnell, O'Brien & Hinton, LLP, for The Scranton Times, L.P. and Jennifer Henn, appellees.

Michael Louis Berry, Gayle Chatilo Sproul, Lee Jay Levine, Levine Sullivan Koch & Schulz, L.L.P., Washington, DC, for appellees amici curiae ABC, Inc., The Assoc. Press, Cable News Network, LP, CBS Broadcasting, Inc., et al.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER and McCAFFERY, JJ.

## *OPINION*

Chief Justice CASTILLE.

Pennsylvania's Shield Law, 42 Pa.C.S. § 5942, protects a newspaper's source of information from compelled disclosure.

With the present appeal, appellants urge this Court to recognize a non-textual "crime-fraud" exception to the Shield Law that would permit compelled disclosure of a newspaper's source if the communication between the newspaper reporter and the source itself constituted a criminal act. For the following reasons, we decline to adopt any such exception and affirm the Superior Court's reversal of the trial court's order compelling disclosure of the confidential source.

In late 2003, at the request of the Attorney General of Pennsylvania, the Twentieth Statewide Grand Jury was empaneled to investigate allegations of wrongdoing at the Lackawanna County Prison. On December 2, 2003, appellants Randall A. Castellani and Joseph J. Corcoran, then-Lackawanna County Majority Democratic Commissioners, testified before the Grand Jury pursuant to duly-served subpoenas. On January 12, 2004, appellees *The Tribune* (Scranton) and *The Scranton Times* (collectively "*The Scranton Times–Tribune*") published front-page stories accusing appellants of "stonewalling" the Grand Jury. The stories were authored by appellee staff writer Jennifer Henn and are nearly identical. The headline in *The Tribune* read, "Dems stonewall grand jury: Corcoran, Castellani evasiveness infuriates jurors, source claims." *The Scranton Times* headline read, "Dems Stonewall: Source: Corcoran, Castellani Vague Before Grand Jury." The articles described appellants' testimony as follows:

[Appellants] were less than can-did [sic], The Times Tribune has learned.

[Appellants] were "considerably less cooperative" with the jurors, often responding with vague, evasive answers, including "I don't recall" and "not that I'm aware of[,]" a source close to the investigation said.

"[Appellants'] testimony really irritated the jurors. [The jurors] were ready to throw both of them out," the source said.

"After months of hearing all kinds of detailed, specific information and testimony, [the jurors] just had no tolerance for that kind of crap."

"[The jurors] were ready to take out the big hook and yank each of them out of the witness chair."

*Castellani v. Scranton Times, L.P.*, 73 Pa. D. & C.4th 483, 486–87 (Pa.Com.Pl. Lackawanna 2005) (quoting Jennifer L. Henn, *Dems Stonewall*, SCRANTON TIMES, Jan. 12, 2004, at 1; Jennifer L. Henn, *Dems stonewall grand jury*, TRIBUNE (Scranton), Jan. 12, 2004, at A1). The articles attributed the above information to "an unnamed source close to the investigation." *Id.* at 487.

Shortly after the publication of the articles, appellants presented the Grand Jury's supervising judge, the Honorable Isaac S. Garb, with a petition for sanctions based on alleged disclosures of the Grand Jury proceedings to the newspapers. Judge Garb denied the petition due to lack of standing, but appointed a special prosecutor to investigate the source of the alleged unlawfully disclosed matters. Upon review of the special prosecutor's report, Judge Garb, in a memorandum, concurred with the special prosecutor and concluded that there was no breach of secrecy by any agent of the Attorney General's office. In his memorandum, Judge Garb noted:

> The reports published in these newspapers are completely at variance with the transcript of the testimony of [appellants]. The newspaper reports provide that [appellants] were evasive in their answers, were non-cooperative, essentially "stonewalled" the Grand Jury in its inquiry and that the Grand Jurors became irate as a result of th[e] demeanor on [appellants'] part, and demanded that they be "thrown out" of the Grand Jury courtroom. None of those things happened. Obviously, if someone wished to leak the testimony of a witness to the Grand Jury that information relayed to the media would have reflected the testimony that actually occurred. The report of [appellants'] testimony was totally at a variance and not borne out by the record of [appellants'] testimony. Obviously, the source of the reporter's information was someone not privy to the Grand Jury proceedings and, therefore, not someone in the Office of the Attorney General.

*In re Twentieth Statewide Investigating Grand Jury,* No. 15 M.D. 2003, Notice No. 16, at 2 (unnumbered) (Pa. Com. Pl. Dauphin Sept. 14, 2004).[1]

On January 7, 2005, appellants filed a civil complaint against *The Tribune, The Scranton Times,* and Henn (collectively "appellees"), claiming that the news articles were false and contained "defamatory statements, innuendo, and implications." Appellants further claimed that the articles' source engaged in "tortious, criminal, or contemptuous conduct," and stated that it is the policy of *The Scranton Times–Tribune* to waive any confidentiality if a "source lies to the newspaper." In support of their claim that the articles were false, appel-

---

1. A separate special prosecutor was appointed to investigate similar allegations of grand jury leaks with respect to Lackawanna County Investigating Grand Jury VIII, 2003. The county grand jury, empaneled on September 18, 2003, investigated allegations of abuse of county prisoners by Lackawanna County Prison guards, though prisoner abuse was not originally identified as a potential subject for inquiry. The county special prosecutor was appointed after a motion to quash the Lackawanna County Grand Jury presentment, which recommended that criminal charges be filed against prison guards, was filed by one of the guards based on the alleged dissemination of secret grand jury information by the Lackawanna County District Attorney's Office to appellee Henn. The motion to quash alleged that numerous e-mails were exchanged between Henn and a member of the Lackawanna County District Attorney's Office which encompassed grand jury information. The motion also averred that Henn met with this member of the District Attorney's office at Farley's, a local bar, following the prison guard's grand jury appearance. In addition to the newspaper articles presently at issue before this Court, *The Scranton Times–Tribune* also published a number of articles authored by Henn on the investigations of the county grand jury. After the special prosecutor submitted his report, the Honorable Terrance R. Nealon, in his capacity as the Supervising Judge of the Lackawanna County Investigating Grand Jury, denied the motion to quash. In his opinion, Judge Nealon recounted the facts surrounding the alleged county grand jury leaks, as well as the alleged statewide grand jury leaks, and, after reviewing the special prosecutor's report, concluded that the report did not demonstrate that secret matters occurring before the grand jury were divulged to Henn by the prosecution. Noting that Henn voluntarily divulged the identity of her source(s) to the special prosecutor, Judge Nealon determined that the motion to quash did not implicate the Shield Law. Judge Nealon concluded that the report did not establish that an alleged grand jury leak substantially influenced grand jury deliberations and accordingly denied the motion to quash. *See In re County Investigating Grand Jury VIII, 2003,* No. 03 MISC 140, 2005 WL 3985351 (Pa. Com. Pl. Lackawanna Oct. 25, 2005).

lants referenced the memorandum of Judge Garb, as well as the grand jury presentment, which did not contain any criticism of appellants by the grand jurors and described appellants as cooperative. Appellants maintained that they had exhausted all efforts to obtain the identity of the articles' source and, of central importance to the present appeal, demanded that appellees disclose the source.

Citing the Pennsylvania Shield Law and the First Amendment reporter's privilege,[2] appellees refused appellants' requested disclosure. Appellants filed a motion to compel in the Court of Common Pleas of Lackawanna County ("trial court") and served appellees with interrogatories seeking the identity of their source. Appellees again refused, citing the Shield Law and the reporter's privilege. Thereafter, the trial court received briefs from the parties and conducted a hearing on appellants' motion to compel.

On June 3, 2005, the trial court granted appellants' motion and ordered appellees to divulge the identity of the source for their January 12, 2004 articles. In his opinion, the Honorable Robert Mazzoni concluded that the privileges afforded reporters under the Shield Law and the First Amendment should not be asserted to the detriment of the grand jury system and an individual's constitutional right to reputation under the Pennsylvania Constitution.[3] Judge Mazzoni found that when the Shield Law "clashes with the need to enforce and protect the foundation of the grand jury purpose, the Shield Law should relinquish its priority." *Castellani*, 73 Pa. D & C.4th at 514. Judge Mazzoni stated further:

2. The Shield Law is quoted in its entirety *infra*. The First Amendment of the U.S. Constitution provides that "Congress shall make no law ... abridging the freedom of speech, or of the press[.]" U.S. Const. amend. I.

3. Article I, Section 1 of the Pennsylvania Constitution provides that:
All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and **reputation,** and of pursuing their own happiness.
Pa. Const. art. I, § 1 (emphasis added).

The court recognizes and accepts the purpose of the Shield Law and the First Amendment qualified privilege. The court also recognizes and embraces the importance of the public function served by the news media. The limited application of this ruling will not have a chilling effect on the ability of reporters to investigate and report on matters of public concern. By this ruling, we are hopeful that the news media recognizes that grand jury proceedings are confidential and are to remain so. It is the re-publication of a grand jury "leak" in a newspaper of general circulation which denigrates the process. The news media should not act as a protective vessel into which criminal communications are channeled and later exonerated at the expense of our judicial system. We are not advocating a broad application of this opinion. We recognize the need for a reporter to rely upon confidential sources in investigating and reporting on criminal activity and on ongoing criminal investigations. The public interest is not served, however, when a reporter, through an unnamed source, invades the grand jury process and pierces its recognized veil of confidentiality.

*Id.* at 514–15. The trial court also distinguished this case from prior Shield Law cases by noting that here "[t]he communication does not talk about a crime—it is the crime" and that the publication of purported grand jury information "significantly magnifies the criminal invasion and ultimately 'chills' and undermines the grand jury process." *Id.* at 515, 515–16.

Appellees filed a notice of appeal in the Superior Court pursuant to Pa.R.A.P. 313 (collateral order rule).[4] The trial court subsequently amended its order, stating that the order involved a controlling question of law and that an immediate appeal would materially advance the ultimate resolution of the matter, thus offering the prospect of another avenue for

**4.** The collateral order doctrine authorizes an interlocutory appeal when the order at issue is: (1) separable from and collateral to the main cause of action; (2) involves a right which is too important to be denied review; and (3) presents a question for review that will be irreparably lost if review is postponed until final judgment in the case. *See* Pa.R.A.P. 313(b).

interlocutory review. In a published opinion, the Superior Court first determined that the order qualified as an appealable collateral order under Rule 313.[5] On the merits, the panel concluded that appellees should not have been compelled to divulge the identity of their source, and accordingly reversed the order of the trial court. *Castellani v. Scranton Times, L.P.*, 916 A.2d 648, 652–53, 655 (Pa.Super.2007).[6] The panel held that the trial court's recognition of a "crime-fraud" exception to the Shield Law conflicted with this Court's case law, notwithstanding the exception's limited application to violations of grand jury secrecy. *Id.* at 655. Specifically, the panel deemed itself constrained by *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), which recognized that the Shield Law, as written, may allow reporters to conceal or cover up crimes, and *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 532 A.2d 346 (1987), which reaffirmed *Taylor's* central holding that the Shield Law protects the identity of confidential sources. In conclusion, the panel stated that:

5. Applying Rule 313, the panel determined that: (1) whether a court should engraft a crime-fraud exception onto the Shield Law is certainly an issue separable from the underlying defamation claim; (2) the effect of a potential crime-fraud exception on the deeply rooted public policy interests protected by the Shield Law and the First Amendment reporter's privilege—freedom of the press and the free flow and exchange of ideas to news media—is obviously an important issue worthy of appeal; and (3) this Court has recognized that after final judgment, there is no effective means of reviewing an order compelling the production of putatively protected material. *Castellani v. Scranton Times, L.P.*, 916 A.2d 648, 652–53 (Pa.Super.2007) (citing, *inter alia, Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547, 551–52 (1999)). The panel also noted that in *Schwartz*, this Court recognized that a discovery order is appealable under the collateral order doctrine when the appeal involves an issue concerning the application of a privilege that is separable from the underlying issue and which may be addressed on appeal without consideration of the underlying issue. *Id.* at 652 (citing *Schwartz*, 729 A.2d at 551–52). Presently, the parties do not dispute the appealability of the order at issue *sub judice*, and since the question is not jurisdictional, we offer no view on the collateral order issue.

6. While their first appeal was pending, appellees filed in the Superior Court a petition for permission to appeal under Pa.R.A.P. 312 and Pa.R.A.P. 1311, citing the trial court's amended order. Concluding that the trial court's interlocutory discovery order was appealable under the collateral order doctrine, the Superior Court denied the subsequently filed petition as moot. *Castellani*, 916 A.2d at 652.

While we are both mindful of and sympathetic to the concerns of the learned trial court regarding possible criminal violations of the grand jury process *vis-à-vis* the Shield Law privilege, we, like the trial court, are forbidden from reading into the Shield Law an exception neither enacted by the General Assembly nor found by the Supreme Court as the result of a developing body of law.

*Castellani,* 916 A.2d at 655.

In an opinion concurring in the result, then-Judge (now Madame Justice) Debra Todd stated that she would leave open the possibility that there may be circumstances, such as the criminal prosecution of a grand jury leak, under which the Shield Law may have to yield. *Id.* at 655–56 (Todd, J., concurring in the result). Like the trial court, Judge Todd noted that, here, Henn was an integral part of, and possibly the sole witness to, a crime. But, continued Judge Todd, this is a defamation action and appellants are seeking the disclosure of a confidential source within that context. Thus, Judge Todd concluded, "[t]he public interest in grand jury secrecy will be vindicated only indirectly." *Id.*

■ The question accepted for appeal is whether the Shield Law protects media defendants in a defamation case from the court-ordered disclosure of the confidential source of an allegedly defamatory newspaper article, where the plaintiffs allege that the media defendants and the source were direct participants in the criminal disclosure of grand jury proceedings. Because the issue presented is a question of law, our scope of review is plenary and our standard of review is *de novo.* *Commonwealth v. Davidson,* 595 Pa. 1, 938 A.2d 198, 203 (2007).

The Shield Law was originally enacted in 1937, long before the U.S. Supreme Court turned its attention to First Amendment law concerning freedom of the press and libel. *See N.Y. Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (holding that to recover in defamation action, public official must show that defamatory statement was made with "actual malice"); *Curtis Pub'g Co. v. Butts,* 388

U.S. 130, 164, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (extending "actual malice" requirement to "public figures"); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345–46, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (holding that private individual not required to show actual malice to recover in defamation action against publisher or broadcaster). The statute addresses confidential communications to news reporters as follows:

> **(a) General rule.**—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.
>
> **(b) Exception.**—The provisions of subsection (a) insofar as they relate to radio or television stations shall not apply unless the radio or television station maintains and keeps open for inspection, for a period of at least one year from the date of the actual broadcast or telecast, an exact recording, transcription, kinescopic film or certified written transcript of the actual broadcast or telecast.

42 Pa.C.S. § 5942. Most recently reenacted in 1976, effective in 1978, the current Shield Law is substantially a reenactment of the original 1937 statutory text.

Appellants claim that the Shield Law should not protect appellees from disclosure because the communication between Henn and her alleged source violated the Grand Jury Act and thus constituted a criminal act.[7] Appellants explain that this is not a case where a newspaper properly obtained information from a source who had obtained the information illegally.

---

7. In support of this contention, appellants cite Section 4549 of the Grand Jury Act and Section 5101 of the Crimes Code. *See* 42 Pa.C.S. § 4549(b) ("All such persons shall be sworn to secrecy, and shall be in contempt of court if they reveal any information which they are sworn to keep secret."); 18 Pa.C.S. § 5101 ("A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act[.]").

Here, appellants contend, the communication between the reporter and the alleged source was itself a criminal act. Therefore, conclude appellants, this Court should devise a crime-fraud exception to the Shield Law. Referencing *Taylor, supra,* which analogized the reporter's privilege to the attorney-client and priest-penitent privileges, appellants maintain that the reporter's privilege cannot be more expansive than these other privileges, both of which contain a crime-fraud exception.

In urging this Court to adopt a non-textual crime-fraud exception to the Shield Law, appellants contend that, unlike the lower courts, "this Court has the inherent power and authority to interpret the Shield Law to not apply—despite the statute's 'absolute' language—where the reporter has been used to commit a fraud and/or a crime." Appellants' Brief at 24–25. Appellants assert that this Court has previously rejected the claim that the Shield Law is unambiguous and absolute, and has engaged in statutory interpretation beyond the statute's plain language. Noting that the operative language of the Shield Law, as well as *Taylor's* construction of that language, was set forth prior to the constitutionalization of defamation law, appellants contend that the Superior Court failed to recognize that the stringent burden of proof placed on "public official" defamation plaintiffs since *New York Times v. Sullivan, supra,* has caused this Court to gradually narrow the scope of the Shield Law. Further, appellants cite *Hatchard's* observation that if the Shield Law provided an absolute shield against discovery of any information in the possession of a defamation defendant, then the Shield Law may be unconstitutional given "the protection of other fundamental values protected by the Pennsylvania Constitution such as an individual's reputation." *Hatchard,* 532 A.2d at 349.

Appellants maintain that there are no reported Pennsylvania decisions, prior to this case, which have considered whether the Shield Law prevents discovery of an illegal communication. Contrary to the Superior Court's conclusion, appellants argue that neither *Taylor* nor *Hatchard* controls the resolution of the present issue. Appellants contend that, unlike the

present case, neither *Taylor* nor *Hatchard* involved an illegal communication where the reporter participated in the commission of a crime. Addressing *Taylor's* broad reading of the Shield Law, which admittedly would allow reporters to conceal crimes, appellants argue that *Taylor* was referring to past crimes and not to communications which themselves are criminal. Thus, appellants submit that this is an issue of first impression.

Appellants liken the present scenario to *Nadler v. Warner Co.*, 321 Pa. 139, 184 A. 3 (1936), where, notwithstanding the "absolute" statutory language of the attorney-client privilege, this Court recognized a crime-fraud exception. Appellants assert that this Court has at one time held every type of privilege—accountant-client, husband-wife, priest-penitent, psychologist-patient—inapplicable where it would further a crime or fraud pursuant to our constitutional authority to interpret the scope and application of all evidentiary privileges, rather than pursuant to any regulatory authority over the parties to the privileges. Citing *Commonwealth v. Bowden*, 576 Pa. 151, 838 A.2d 740 (2003), which described the Shield Law as protecting only "confidential" communications, appellants contend that the attorney-client privilege is similar to the Shield Law/reporter's privilege because both are directed at confidential communications. Appellants also note that the intent of each privilege is similar—to promote open communications between the parties to the privilege. Because the interests behind the Shield Law will not be harmed by requiring *The Scranton Times–Tribune* to disclose the identity of a source whose information has twice been judicially determined to be false, appellants argue that a crime-fraud exception should be applied to prevent the Shield Law from being used to protect an illegal communication of no value. In further support of their position, appellants cite *The Scranton Times–Tribune's* own internal policy, which provides that agreements of confidentiality will not be honored if the source lies to the newspaper.

Appellants also maintain that a majority of our sister states have authorized exactly what appellants urge—judicially com-

pelled production of a reporter's source where the communication was criminal or fraudulent. Appellants contend that only ten states seem to have an absolute statutory reporter's privilege, while thirty-six states permit compelled disclosure of a defamatory news article's confidential sources, even in the absence of evidence of crime or fraud. Further, appellants assert that no court in an "absolute" shield law state has held that its shield law protects a reporter from disclosing the source of a communication when the requesting party has made a *prima facie* showing that the communication was itself criminal or false.[8] Citing *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), appellants also note that the U.S. Supreme Court has declined to recognize a reporter's privilege under the First Amendment. Further, appellants state that federal courts, most recently in *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C.Cir.2005), have consistently required reporters to disclose confidential sources during litigation.

Finally, appellants contend that the Shield Law cannot protect a lie. Appellants also raise the possibility that Henn's "unnamed source close to the investigation" may have been largely, or entirely, fictional. If that were the case, argue appellants, appellees' invocation of the Shield Law is a continuing fraud upon the courts and frustrates any investigation into the alleged wrongdoing. In sum, appellants argue that a reporter should not be permitted to use the Shield Law to obstruct criminal or civil inquiries into the illegal disclosure and publication of false and/or defamatory information. The public policies underlying a reporter's privilege, continue ap-

8. Appellants primarily rely on California authority, which holds that discovery of a reporter's unnamed source is appropriate when the reporter is a defendant in a libel action. *See Mitchell v. Superior Court*, 37 Cal.3d 268, 208 Cal.Rptr. 152, 690 P.2d 625 (1984). Appellants also cite *Farr v. Superior Court*, 22 Cal.App.3d 60, 99 Cal.Rptr. 342 (1971), which held that the reporter's privilege in the state rules of evidence could not be invoked to shield a reporter from contempt for failing to disclose the identity of attorneys who leaked a statement to the reporter in violation of a gag order. Appellants note that the holding in *Farr* was affirmed twenty-five years later in *In re Willon*, 47 Cal.App.4th 1080, 55 Cal.Rptr.2d 245 (1996).

pellants, are not furthered when a reporter knowingly partici-
pates in a crime or fraud.

Appellees counter that this Court has repeatedly held that
the Shield Law unambiguously provides an absolute privilege
against compelled disclosure of: (1) the identity of confidential
sources; and (2) any information which could lead to the
disclosure of the source's identity.[9] Appellees note that while
this Court has the inherent authority to construe a statute in
accordance with core principles of statutory construction, we
do not have the authority to rewrite a statute or alter a
statute's plain meaning. Appellees contend that appellants
would have this Court ignore the plain and unambiguous
language of the Shield Law and substitute an interpretation
that the Legislature, if it had so desired, could easily have
included within the express language of the statute.

Appellees maintain that this Court's Shield Law precedents
should foreclose appellants' arguments. First, argue appel-
lees, this Court has already resolved appellants' primary
claim—that the Shield Law cannot protect the identity of a
confidential source where the communication was criminal
and/or fraudulent—when it rejected that very argument in
*Taylor*. Appellees dismiss as legally insignificant appellants'
attempt to distinguish *Taylor* on grounds that *Taylor* did not
involve a reporter who participated in criminal or fraudulent
conduct. Appellees argue that *Taylor* addressed the precise
issue before this Court today and concluded that the statutory
right conferred by the Legislature must be applied even if the
Shield Law's protections would operate to conceal evidence of
a crime.

Second, continue appellees, appellants ignore this Court's
decision in *Sprague v. Walter*, 518 Pa. 425, 543 A.2d 1078
(1988), which held that the Shield Law applies with full force

9. *Amici Curiae* ABC, Inc. *et al.* echo appellees' emphasis on the absolute
nature of the Shield Law, harkening back to the American Revolution
and this Commonwealth's infancy when Pennsylvania began its long-
standing dedication to the free flow of information and protection of
confidential sources, a dedication that was later embodied in the Shield
Law. *Amici* note that since its enactment in 1937, the Legislature has
never amended the Shield Law to provide additional exceptions.

in the context of a defamation action and precludes the compelled disclosure of a defendant-newspaper's confidential source. Third, argue appellees, the Shield Law protects confidential sources notwithstanding the constitutional dimensions of an individual's fundamental right to his or her reputation under the Pennsylvania Constitution, a right that is naturally implicated in a defamation complaint. Finally, continue appellees, *Hatchard* rejected the very argument appellants now posit, *i.e.,* the notion that the constitutionalization of defamation law permits or requires altering the plain text of the Shield Law.

Accordingly, appellees maintain that appellants' argument reduces itself to the proposition that Pennsylvania courts are free to carve out exceptions to plain and unambiguous statutes to serve competing policy interests, such as, as posed in this case, grand jury secrecy. Appellees argue that, even if principles of statutory construction did not foreclose such action, overriding the Shield Law's mandate in the context of this libel suit would not vindicate the interests advanced by the secrecy provision of the Grand Jury Act. This is so because whether a violation of grand jury secrecy occurred here is incidental to appellants' defamation action.

Appellees further contend that the plain language of the Shield Law precludes the creation of a crime-fraud exception. Contrary to appellants' argument, explain appellees, the attorney-client privilege and the Shield Law are not analogous. Appellees submit that the crime-fraud exception to the attorney-client privilege was recognized at common law prior to codification of the privilege. Conversely, appellees maintain, a judicially created crime-fraud exception to the Shield Law has no common law antecedent and would require this Court to override the express statutory language and legislative intent of the Shield Law. Appellees contend that, besides ignoring the plain meaning of the Shield Law, appellants' proposed exception would have this Court ignore a fundamental rule of statutory interpretation, which is that exceptions expressed in a statute shall be construed to exclude all others. *See* 1 Pa.C.S. § 1924.

Responding to appellants' reference to the law of other jurisdictions, appellees assert that outside authority regarding the qualified reporter privilege is irrelevant. Appellees contend that federal cases, such as *Judith Miller, supra*, are inapposite because they implicate the qualified reporter's privilege under federal law, not Pennsylvania's absolute Shield Law. Furthermore, appellees argue that the California authorities relied upon by appellants involve that state's qualified reporter's privilege rather than its shield law, which, unlike Pennsylvania's Shield Law, provides immunity from contempt sanctions rather than an absolute privilege. Additionally, appellees assert that no appellate court in any jurisdiction has created an exception to an absolute shield law.[10]

Finally, appellees argue that, contrary to appellants' claims, falsity has not been established in the present case and there is no evidence that any crime was committed. Appellees note that *The Scranton Times–Tribune* could not have been a party to the alleged crime because grand jury secrecy only applies to those who take the oath of secrecy. Moreover, appellees contend that it is unknown whether the source was one who took such an oath. Appellees also maintain that it is not a crime to publish and report on grand jury proceedings, even if the person providing the information is personally bound by grand jury secrecy. Appellees conclude that the crime-fraud exception urged by appellants would result in the impermissible punishment of *The Scranton Times–Tribune* for exercising its First Amendment rights.

■ The matter has been ably briefed and is ready for decision. As we once again undertake consideration of the

10. In fact, appellees claim, the New York Court of Appeals addressed the precise issue before us and held that that state's shield law protected the identity of confidential sources even where the source's act of divulging secret grand jury information to a reporter was itself a criminal act. *See Beach v. Shanley*, 62 N.Y.2d 241, 476 N.Y.S.2d 765, 465 N.E.2d 304, 310 (1984). Additionally, unlike appellants, appellees' *amici* identify fifteen jurisdictions (fourteen states and the District of Columbia) that provide an absolute protection for confidential sources. *Amici* contend that not one of these jurisdictions has recognized an exception requiring the privilege to yield when a communication is allegedly criminal or fraudulent.

Shield Law, we note that, as always, we begin with principles concerning statutory construction. As in *Hatchard,* the question before this Court implicates statutory interpretation; therefore, our initial objective is to ascertain the intent of the Legislature in enacting the statute. *See Hatchard,* 532 A.2d at 348 (citing 1 Pa.C.S. § 1921(a)). As we consider the text of the Shield Law, as well as our prior interpretations of its statutory language, we are always cognizant of the fact that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b).

In *In re Taylor,* 412 Pa. 32, 193 A.2d 181 (1963), an investigating grand jury was convened in Philadelphia in 1962 to investigate allegations of criminal conduct and corruption involving various offices of the Philadelphia city government. Soon thereafter, *The Philadelphia Evening Bulletin* published an article reporting aspects of the investigation. The president/general manager and city editor of *The Bulletin* were subpoenaed to appear before the Grand Jury and directed to bring with them the source information of the articles. Relying on the Shield law, the newspapermen refused to answer certain questions and were held in contempt. *Taylor,* 193 A.2d at 182–83. On review, this Court stated that the Shield Law must be "liberally and broadly construed in order to carry out the clear objective and intent of the Legislature which has placed the gathering and the protection of the source of news as of greater importance to the public interest and of more value to the public welfare than the disclosure of the alleged crime or the alleged criminal." *Id.* at 185–86 (emphasis and footnote omitted). The Court opined that any doubt as to the interpretation of the Shield Law must be liberally construed in favor of the news media because, as the principal government "watch-dogs" and guardians of the general public welfare, the news media serve their city, nation, and state, and are in a sense "pro bono publico." *Id.* at 185.

The *Taylor* Court stated point-blank: application of the plain text of the Shield Law "will enable newsmen to conceal or cover up crimes." *Id.* In support of this conclusion, the

Court compared the Shield Law to other privileges, such as the attorney-client and priest-penitent privileges, under which public policy permits the nondisclosure of information concerning a crime. The Court held that: (1) the words "source of information" in the text of the Shield Law included both individuals and documents; (2) the privilege can, under certain circumstances, be waived; and (3) the newspapermen were not guilty of contempt. *Id.* at 186–87.

A quarter century later, in *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 532 A.2d 346 (1987), this Court refined *Taylor's* broad interpretation when considering whether the Shield Law protects a television station's unpublished documentary information from discovery by a plaintiff in a libel action. As a matter of statutory interpretation, we recognized that the term "source" as used in the Shield Law does not have a plain meaning, though we adhered to *Taylor's* conclusion that "source" included both inanimate objects, such as documents, as well as persons. *Hatchard*, 532 A.2d at 348. Accordingly, the Court looked beyond a plain reading of the words of the statute and considered the Shield Law's statutory purpose—"to maintain a free flow of information to members of the news media"—for guidance. *Id.* at 350. Mindful that it was considering the Shield Law within the context of a defamation case (a fact that distinguished *Taylor*), the *Hatchard* Court observed that if unpublished information that would not reveal confidential sources could be withheld under the Shield Law by a media defendant in a defamation case, then the Shield Law may be incompatible with other fundamental values protected by the Pennsylvania Constitution, such as an individual's interest in his or her reputation. *Id.* at 349. The *Hatchard* Court therefore concluded that the Legislature did not intend to shield **all** information that an alleged defamer had prior to the publication of a defamatory statement, but only intended to shield information that could reveal the identity of a confidential source. Thus, we limited *Taylor's* broad interpretation of the Shield Law, at least for purposes of libel actions, and held that "unpublished documentary information gathered by a television station is discoverable by a

plaintiff in a libel action to the extent that the documentary information does not reveal the identity of a personal source of information or may be redacted to eliminate the revelation of a personal source of information." *Id.* at 351. Following *Hatchard*, a media defendant in a defamation case would not be protected by the Shield Law where the defamation plaintiff seeks information which would not reveal the source's identity. Although *Hatchard* narrowed *Taylor* in the context of libel actions, the core protections of the Shield Law remained steadfast and ironclad-compelled disclosure of the identity, or anything that could expose the identity, of a confidential source was strictly prohibited.

One year later, in *Sprague v. Walter*, 518 Pa. 425, 543 A.2d 1078 (1988), this Court again considered the Shield Law's application in the defamation context. In concluding that invocation of the Shield Law does not establish an affirmative inference regarding the reliability of an unidentified source or the validity of the source's information, the Court reiterated that:

> The clear language of [the Shield Law] provides that persons covered by it are not required to disclose the source of the information "in any legal proceeding, trial or investigation before any government unit." This language is in no way ambiguous and its direction is clear. It was obviously designed to protect the confidentiality of the source, and we are constrained under the rules of statutory interpretation to accept its plain meaning. 1 Pa.C.S. § 1921.

*Sprague*, 543 A.2d at 1082 (emphasis omitted). Most recently, in *Commonwealth v. Bowden*, 576 Pa. 151, 838 A.2d 740 (2003), a reporter invoked the Shield Law and refused to disclose to the Commonwealth pre-trial statements made to him by a defendant on trial for murder. In *Bowden*, we construed *Taylor*, as interpreted by *Hatchard* and *Sprague*, "as standing for the proposition that documents may be considered sources for Shield Law purposes, but only where production of such documents, even if redacted, could breach the confidentiality of the identity of a human source and thereby threaten the free flow of information from confidential informants to the

media." *Bowden*, 838 A.2d at 752. Because the identity of the source was already known and the statements at issue were not confidential, we concluded that the Shield Law did not prevent disclosure of the murder-defendant's statements to the reporter.[11]

■ Although the above cases, of course, are factually distinguishable, *Taylor's* interpretation of the Shield Law, as described by *Bowden*, plainly controls the outcome of the present appeal. There is cause to look beyond the plain language of the Shield Law when interpreting, for example, the scope of the word "source," but the Shield Law's unambiguous text leaves little question as to whether a source's identity is protected. Our Shield Law jurisprudence has consistently recognized the statute's absolute protection of a source's identity from compelled disclosure. For that reason alone, we cannot simply engraft upon the statute an exception which would not only contradict the well-established public policy underlying the Shield Law, but, as importantly, would

11. Because the source's identity—and thus the Shield Law—was not at issue in *Bowden*, the Court applied the qualified reporter's privilege stemming from the U.S. Supreme Court's decision in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). In *Bowden*, we noted that although *Branzburg* held that requiring reporters to testify before grand juries did not violate the First Amendment freedoms of speech and press, the U.S. Court of Appeals for the Third Circuit had indicated that a majority of the *Branzburg* Justices supported some quantum of privilege for reporters. *Bowden*, 838 A.2d at 752. After acknowledging the Third Circuit's recognition of a qualified reporter's privilege in *Bowden*, we applied the Third Circuit's three-prong test described in *United States v. Criden*, 633 F.2d 346, 358–59 (3d Cir.1980), which a party must satisfy to overcome the privilege. *Bowden*, 838 A.2d at 752, 755–59. Under the Third Circuit's test, the party seeking to overcome the privilege must demonstrate that: (1) it has made an effort to obtain the information from other sources; (2) the information is only accessible through the reporters and their sources; and (3) the information is critical to the case. *Id.* In *McMenamin v. Tartaglione*, 139 Pa.Cmwlth. 269, 590 A.2d 802, 811, *aff'd*, 527 Pa. 286, 590 A.2d 753 (1991), the Commonwealth Court recognized a reporter's privilege when it held that a reporter's First Amendment privilege against testifying was properly invoked by a newspaper reporter who refused to testify as to the accuracy of statements made at a press conference. The Commonwealth Court also distinguished the reporter's privilege from the Shield Law, stating that the latter clearly applies to a reporter protecting his confidential sources. *Id.*

contravene the statute's unambiguous text. The Shield Law has been reenacted three times since it was first enacted in 1937, and twice since this Court interpreted its text in *Taylor.* If the General Assembly disagreed with our interpretation, or wished to establish a crime-fraud exception to the Shield Law, it could easily have done so. *See* 1 Pa.C.S. § 1922(4) ("[W]hen a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.") The Shield Law provides for one exception, which is not at issue here, *see* 42 Pa.C.S. § 5942(b), and we are not at liberty to create others that the Legislature, in its wisdom, chose not to include in the text of the statute. In this regard, it is notable that, although the Superior Court described *Hatchard's* holding limiting *Taylor* as an "exception" to the Shield Law, *Hatchard* in fact merely addressed information deemed to be outside the purview of the Shield Law.

While non-binding federal law and the law of our sister states is often informative, due to our Shield Law's absolute protection of a sources identity, the manner in which other jurisdictions have dealt with similar situations is of minimal value to the present appeal. In the cases referenced by appellants, the federal courts and courts in our sister states were interpreting their own, unique shield laws, or, as in *Judith Miller, supra,* the qualified reporter's privilege. In resolving the present controversy, we have only the plain text of Pennsylvania's Shield Law. Moreover, even if case law from other jurisdictions were more directly relevant, appellants have not offered any authority demonstrating that a court in an absolute protection jurisdiction has ever recognized a non-textual crime-fraud exception to its shield law.

 Turning to appellants' analogy to recognized evidentiary privileges, contrary to appellants' claim, we conclude that the Shield Law is not comparable to the attorney-client privilege, or, for that matter, to any other privilege with respect to the issue presented here. The attorney-client privilege, in contrast, does not encompass the same absolute protection.

The foundational reason for this difference is that each privilege or protection serves its own, unique interests. The Shield Law was enacted to protect the free flow of information to the news media in their role as information providers to the general public. The attorney-client privilege, on the other hand, renders an attorney incompetent to testify as to communications made to him by his client in order to promote a free flow of information only between attorney and his or her client so that the attorney can better represent the client. *See* 42 Pa.C.S. § 5916.

In *Nadler, supra,* this Court recognized a crime-fraud exception to the attorney-client privilege to prevent a client from abusing the privilege in furtherance of a crime or fraud. No such purpose would be served by recognizing a similar exception to the Shield Law. Whereas the attorney-client privilege is for the benefit of the client, as privilege holder, the protections recognized in the Shield Law are intended to allow the news media to serve the public. Indeed, describing the Shield Law's protections in common evidentiary privilege terms, while the news media may be the "holder" of the protection, the general public is deemed to be the overall beneficiary of the Shield Law's protections.

The trial court's narrower crime-fraud exception, which would be applicable only in the grand jury context, whatever its value might be as a matter of policy, is also unsupportable. Section 4549 of the Grand Jury Act provides that persons sworn to secrecy during grand jury proceedings shall be in contempt of court if they reveal any information which they are sworn to keep secret. 42 Pa.C.S. § 4549(b). The reasons for ensuring grand jury secrecy have been described as follows:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand

jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect [the] innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*In re Investigating Grand Jury of Phila. County,* 496 Pa. 452, 437 A.2d 1128, 1130 (1981) (quoting *United States v. Procter & Gamble Co.,* 356 U.S. 677, 681 n. 6, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)).

After considering what he deemed the "competing and conflicting" interests of the Shield Law and the Grand Jury Act, Judge Mazzoni, in his thorough opinion below, determined that "the Shield Law should relinquish its priority" and yield to the public interest in grand jury secrecy. *Castellani,* 73 Pa. D. & C.4th at 514. The trial court was of the opinion that striking such a balance and creating a limited exception to the Shield Law would put the news media on notice that "grand jury proceedings are confidential and are to remain so." *Id.*

▮▮▮ While we share the trial court's concern for the integrity of the grand jury process, the exception it recognized is not supported by the text of the Shield Law. It is, in the first instance, a question of policy suited to the legislative branch to align the values of the two potentially "competing" statutes. In addition, we note that hampering the news media in the performance of their essential function would not necessarily remedy or prevent violations of the Grand Jury Act. Only the grand jury participants are bound by the oath of secrecy, and it is their duty, as well as the responsibility of the courts, to uphold the integrity of the grand jury process. As for appellants' alleged "criminal communication," because only the individual swearing the oath can violate grand jury secrecy, it is the speaker in appellants' scenario, and not the listener, who has the capacity to commit a crime. Thus, under the present circumstances, although appellees may have published defamatory information, they did not commit a crime.

Appellees may indeed have been on the receiving end of a criminal communication, but it was the opening of the speaker's mouth which violated the Grand Jury Act, not the attentiveness of the listener's ears. Of course, the media should act responsibly in exercising their statutory right, and when they do not, they may be answerable in defamation. And, examples of irresponsible journalism are known. But, the news media have a right to report news, regardless of how the information was received. The exception crafted by the trial court penalizes the news media for another's crime and is in direct tension with our decision in *Taylor*, which recognized that the Shield Law protects a journalist's source information from disclosure, even if such protection would conceal or cover-up a crime.

Notably, it appears that the alleged criminal violations of the Grand Jury Act in the present case were adequately investigated by the authorities without implicating the Shield Law. Following the allegations of a breach of grand jury secrecy involving appellee Henn, the supervising judges of both the Statewide Grand Jury and the County Grand Jury appointed special prosecutors to investigate the leaks. After receiving the prosecutors' reports, both were satisfied that the integrity of their respective Grand Juries had been maintained (though the reports only addressed potential breaches by the District Attorney's Office and the Attorney General's Office).[12] Thus, the statewide special prosecutors investigation and report did not reveal, and appellants have not proven, that the alleged violations actually took place. Revealingly, as then-Judge (now Justice) Todd noted in her concurrence below, this is a defamation case and "[t]he public interest in grand jury secrecy will be vindicated only indirectly." *Castellani*, 916 A.2d at 656 (Todd, J., concurring).[13] In other words, because

12. As for the alleged County Grand Jury leaks, Henn voluntarily divulged her source for the articles when questioned by the county special prosecutor, making application of the Shield Law moot.

13. Our holding does not discount the important interests implicated in every defamation action, notably, the individual's fundamental right to his or her reputation as guaranteed under the Pennsylvania Constitution. The proper balance between that compelling interest and the

this is a defamation action, where the plaintiffs are seeking monetary damages rather than the restoration of the grand jury's integrity, the public's interest in the free flow of information to the news media is not presently in conflict with the public's interest in grand jury secrecy.[14]

The Dissenting Opinion by Mr. Justice McCaffery would hold that, under the "unique circumstances" of this case, the constitutional interests in the protection of a defamation plaintiff's reputation should outweigh the Shield Law's protections. Specifically, the Dissent would hold that where a defamation plaintiff makes a "colorable showing that the alleged 'unnamed source' may not, in fact, exist at all," a media defendant can be compelled to disclose the identity of the source. *See* Dissent Op. at 955. Respectfully, the Dissent appears to concern itself with an issue that is not before this Court, and premises its holding upon a factual assumption that is not the focus of the case argued. The issue raised, therefore, would seem to be more suited to a concurrence than to a dissent.

The Dissent states that the findings of Judge Garb "could readily support" the conclusion that the articles were actually not based on any source at all. *Id.* at 955. But Judge Garb made no specific findings along those lines. Although Judge Garb believed that the articles were inconsistent with appellants' actual appearances before the Grand Jury, he never suggested that the source of the articles "may have been largely, or entirely, fictional." *See id.* at 955.

Furthermore, the Dissent's legal finding appears to be unresponsive to the narrow legal argument presented to this

Shield Law, however, was already struck by this Court in *Hatchard* when it refined our interpretation of the Shield Law. *See Hatchard*, 532 A.2d at 348–51.

14. Were a situation to arise, such as that hypothesized by the concurrence below, where the Commonwealth sought a reporter's evidence concerning the source of a grand jury leak in a criminal investigation or prosecution of that leak, then the Shield Law and the secrecy provision of the Grand Jury Act would be more directly in conflict. That question, however, is not before us and we save its consideration for another day. Put another way, we need not determine whether there is any situation where the absolute language of the Shield Law would have to yield to a competing, constitutional value.

Court. Appellants argue that the Shield Law should be subject to a crime-fraud exception, and that they have made a *prima facie* showing that the communication between the reporter and confidential source here furthered a crime and/or fraud. Although appellants advert to the possibility that the confidential source may be fictional, they do not propose the Dissent's "fictional source" exception. Instead, appellants' reference is a component of their crime-fraud exception claim, as they argue only that, if the source proved to be fictional, appellees' continued assertion of the Shield Law would constitute an ongoing fraud upon the courts. The basic premise of appellants' proposed crime-fraud exception, however, assumes that an unnamed source does exist, and took part in a communication that furthered a crime and/or fraud.

The Dissent is further unmoored from the case actually presented in advocating overruling *Sprague, supra,* and disapproving *Hatchard, supra,* to the extent they say that information is not discoverable if it would reveal the identity of a confidential source. No party has asked us to overrule our precedent, and we have no briefing on the considerations affecting *stare decisis.* However legitimate the Dissent's concerns might be in an appropriate case, for decisional purposes, we respectfully do not believe they are appropriate here.

▇▇▇ Accordingly, we reaffirm that the Shield Law prohibits the compelled disclosure of a confidential source's identity, or any information which could expose the source's identity. Thus, the Shield Law precludes the very type of discovery order issued in the present case. Furthermore, we reject the invitation to fashion a non-textual, "crime-fraud" exception to the operation of the statute. The Superior Court's reversal of the trial court's order compelling disclosure of *The Scranton Times–Tribune's* confidential source is affirmed.

Justice TODD did not participate in the consideration or decision of this matter.

Justices SAYLOR, EAKIN and BAER join the opinion.

Justice McCAFFERY files a dissenting opinion.

Justice McCAFFERY, dissenting.

I respectfully dissent from the majority's holding because I believe that it fails to afford adequate weight to the fundamental right of the citizens of this Commonwealth in the protection of their reputations. The Pennsylvania Constitution recognizes the possession and protection of an individual's reputation as an inherent and indefeasible right. PA. CONST. art. 1, § 1. Our Constitution also mandates that every individual whose reputation has been injured "shall have a remedy in due course of law and right and justice administered without sale, denial or delay." *Id.*, § 11.[1] As I see it, the issue in the instant case is the extent to which Appellants' constitutionally protected remedy to vindicate their constitutionally recognized interest in their respective reputations may be limited by application of the Shield Law. I would hold that the unique circumstances of this case warrant the disclosure ordered by the trial court as a necessary discovery tool that should be available to Appellants, and, accordingly, I would reverse the order of the Superior Court.

I disagree with the majority that our decision in *Hatchard v. Westinghouse Broadcasting*, 516 Pa. 184, 532 A.2d 346 (1987), currently strikes the proper balance between Appellants' inherent and indefeasible right to protect their reputations through legal process and Appellees' statutory privilege under the Shield Law. *See* Majority Opinion at 308–09, n. 13, 956 A.2d at 953, n. 13. Rather, I conclude that where, as here, a public figure plaintiff in a defamation action makes a colorable showing that the alleged "unnamed source" may not, in fact, exist at all, that plaintiff may compel the defendant to disclose the identity of the source. Otherwise, the plaintiff is left without the ability to sustain his or her heavy burden to show that the alleged defamer acted with actual malice.[2]

---

1. The right to protect one's reputation is not a second-class right, amenable to being pressed into oblivion by other constitutional provisions. *Norton v. Glenn*, 580 Pa. 212, 860 A.2d 48, 58 (2004).

2. In *Carlacci v. Mazaleski*, 568 Pa. 471, 798 A.2d 186, 190, n. 9 (2002), this Court recognized the applicability of the legal maxim *"ubi jus, ibi remedium"* ("where there is a right, there is a remedy,") in a defamation action seeking expungement of court records.

Appellants' suspicion that the unnamed source may have been largely, or entirely, fictional, is supported by Judge Garb's finding of fact that Appellees' description of the grand jury proceedings was not supported by his review of the grand jury proceedings. Specifically, Judge Garb found that Appellees' reports of Appellants' conduct before the grand jury were inaccurate in that Appellants (1) had not been evasive in their answers; (2) had not been non-cooperative; (3) had not "stonewalled" the grand jury in its inquiry; (4) had not caused the grand jury to become irate as a result of Appellants' demeanor; and (5) had not caused the grand jury to demand that Appellants be "thrown out" of the courtroom. *See* Majority Opinion at 288, 956 A.2d at 940. These findings by Judge Garb could readily support the conclusion that the alleged defamatory portions of the reports published by Appellees were not actually based upon information provided by any source at all. Under these circumstances, Appellants should have been afforded the opportunity to determine with certainty whether Appellees did, in fact, rely upon a source as a basis for the alleged defamatory statements.

In summary, I would overrule our conclusion in *Sprague v. Walter,* 518 Pa. 425, 543 A.2d 1078, 1085 (1988), and disapprove our dicta in *Hatchard,* *i.e.,* that information is **never** discoverable to the extent it would reveal the identity of a confidential source. Instead, I believe we should hold that a public figure plaintiff who makes a colorable showing that an alleged "unnamed source" may not, in fact, exist should be afforded the remedy of compelled disclosure of the identity of the purported source.[3] In such an instance, the constitutional interests in the protection of the plaintiff's reputation should take precedence over the statutorily created confidentiality interest of the alleged defamer. Because the majority reaches a contrary result, I respectfully dissent.

---

**3.** Compelled disclosure here would not affect the trial court's inherent authority to control the course of discovery, and would not necessarily preclude a ruling by the court for in camera inspection by the court prior to disclosure to Appellants. The trial court would then be able to limit the release of the information to Appellants, should the colorable showing of non-existence **not be** supported upon review.