Filed 3/11/16  P. v. Dolphin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KAYMI ELIZABETH DOLPHIN,<br><br>    Defendant and Appellant. | D068245<br><br><br>(Super. Ct. No. SCD258105) |

APPEAL from a judgment of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed.

Steven J. Carroll, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Scott C. Taylor, for Plaintiff and Respondent.

A jury found Kaymi Dolphin guilty of possessing methamphetamine for sale.  The court suspended imposition of the sentence for a three-year period and imposed local

custody for 120 days. Custody was stayed pending Dolphin's completing a residential treatment program.

Dolphin contends the trial court erred in questioning a defense witness and later briefly ordering the witness into custody for refusing to answer a question about the identity of the witness's drug supplier. Dolphin maintains these actions violated her right to a fair trial and the court erred in failing to sua sponte instruct the jury on the reasons the witness was taken into custody. We reject these contentions and affirm.

FACTUAL BACKGROUND

Wal-Mart loss prevention officer Gilberto Meraz began his shift at about 8:00 a.m. on August 18, 2014. At the time, he was told a woman (Dolphin) had been at the store looking for her purse since about 2:00 a.m. After checking the security tapes and the store offices, Meraz found the purse. When Meraz looked inside the purse, he saw a large sum of cash and two baggies containing a powdery substance that appeared to be methamphetamine.

Meraz called the police. The responding police officer told Meraz to ask Dolphin to identify the purse, and if she did so, return the purse and its contents to her. The officer said he would be waiting outside the store. After Dolphin identified the purse and it was returned to her, Dolphin asked a store manager to walk her to her car.

As Dolphin walked outside the store, a police officer told her she was being detained for a narcotics investigation. When asked what kind of drugs were in her purse, Dolphin responded, " 'possibly meth.' " The police officer opened the purse and saw two plastic baggies commonly used to store illegal drugs and $1,623 in cash,

2

mostly $20 bills. The baggies were later found to contain 4.67 grams and 4.17 grams of methamphetamine. Dolphin did not appear to be under the influence of methamphetamine and did not have the appearance of a chronic methamphetamine user. Dolphin had no methamphetamine paraphernalia in her possession.

Police officers also found a cell phone inside Dolphin's purse and later searched the phone's text messages. At trial, the prosecutor presented evidence of these messages in a 14-page exhibit. The exhibit shows numerous incoming texts from individuals seeking small amounts of methamphetamine and outgoing texts from Dolphin agreeing to satisfy these requests in exchange for a money payment.

At trial, the prosecution also called a law enforcement expert who had extensive narcotics training and experience. The expert opined that the 8.84 grams of methamphetamine found in Dolphin's purse were possessed for sale, rather than personal use. He based this conclusion on numerous factors, including: (1) the amount of cash ($1,623) found in the purse and the fact the cash was primarily in $20 bills; (2) the amount of the drugs, given that an average user consumes about .4 grams per day and that users (who are not also sellers) do not usually buy methamphetamine in bulk amounts; (3) the fact that Dolphin had no drug paraphernalia and did not appear to be a chronic user; (4) the street value of the drugs, which was between about $480 and $800; and (5) the nature of the text messages that the expert opined reflected methamphetamine purchases and sales.

Dolphin's defense theory was that the methamphetamine found in her purse was for her personal use and not for sale. In support, her counsel cross-examined the

3

prosecution's expert on the grounds for his opinions that the drugs were possessed for sale, eliciting his agreement that other conclusions were possible (although not likely). Dolphin did not testify, but presented two witnesses primarily to explain why she had the large sum of cash in her purse at the time she was arrested.

First, she called David Roe, a bail agent for a bail bonding company. Roe testified that Dolphin called him on the evening of August 17, 2014 (one day before her arrest) regarding bail for a person named Jesse Hoover. Roe testified that Hoover's case had a "1275 hold," which he said means that generally cash is not an acceptable form of payment for a bail.

The second witness was Tracey Bojorquez, Dolphin's friend. Bojorquez admitted she was a methamphetamine user, had pled guilty to a methamphetamine possession charge, and frequently used methamphetamine with Dolphin during August 2014. Bojorquez said Dolphin was a methamphetamine addict at the time.

Bojorquez testified that on August 5 (about two weeks before Dolphin's arrest), Bojorquez and Hoover were arrested for methamphetamine possession. Bojorquez said she and Dolphin then attempted to obtain money to bail Hoover out of jail by having Dolphin collect cash from their friends. Bojorquez said she gave $300 to Dolphin in this effort. Once Dolphin collected the cash, the two women learned they could not use the money for the bail because Hoover had a "hold" requiring "a credit card or someone to co-sign." Bojorquez and her mother then paid the full bail amount on a credit card. Bojorquez identified text messages on her cell phone that she said supported this sequence of events.

4

During cross-examination, the prosecutor asked Bojorquez whether Dolphin was the person who supplied her with methamphetamine in August 2014. After substantial reluctance to respond to the question, Bojorquez denied that she obtained methamphetamine from Dolphin, but refused to identify the person who did provide her with the drugs. As detailed below, after determining the information was relevant and there was no applicable privilege, the court ordered Bojorquez to answer the question regarding the identity of the person providing the drugs to her. When Bojorquez refused to abide by this order, the court held her in contempt of court and had the bailiff take her into custody while the jury was present. A short time later, Bojorquez came back to the witness stand and identified two people (not Dolphin) who had supplied her with the methamphetamine.

During redirect, defense counsel elicited testimony that Bojorquez did not want to identify her methamphetamine suppliers because she was afraid to do so and they were her friends.

After deliberating for about 90 minutes, the jury found Dolphin guilty of possessing the methamphetamine for sale. (Health & Saf. Code, § 11378.)

DISCUSSION

Dolphin's sole appellate challenge concerns the court's handling of witness Bojorquez's initial refusal to identify the person who provided her with methamphetamine. Dolphin contends the court denied her a fair trial by (1) questioning this witness directly; and (2) ordering Bojorquez handcuffed and taken into custody for failing to respond to the prosecutor's question. Dolphin additionally contends the court

5

erred in refusing to sua sponte provide the jury with an explanation for Bojorquez's custody status.

## A. *Relevant Background Facts*

At the outset of her cross-examination of Bojorquez, the prosecutor noted Bojorquez's testimony that she used methamphetamine with Dolphin, and asked: "Who did you get your methamphetamine from [in August 2014]?" Defense counsel objected based on relevance. The court overruled the objection, and told Bojorquez to answer the question. Defense counsel asked whether counsel could approach the sidebar, but the court said "After she answers the question." The court said to Bojorquez, "You're under oath. You have to answer the question." Bojorquez responded that she would "like to talk to my lawyer."

After a sidebar discussion, the trial judge said he was going to ask the witness "a couple of questions myself." During this brief questioning (while the jury was present), the court elicited certain foundational information, including that Bojorquez obtained the drugs from someone both she and Dolphin knew, and that Bojorquez obtained the drugs from a "few" people. The court then said it would recess for the day, and it was going to conduct a hearing outside the presence of the jury "and then I'll make a determination as to what to do with the remainder of [Bojorquez's] testimony."

After the jury was excused, the court said it would ask Bojorquez a few questions to determine whether she needed to speak with an attorney. In response to these questions, Bojorquez said the drugs were given to her and she did not purchase them, but she did not want to identify the person who gave them to her. The court stated that

6

Bojorquez did not have a privilege to remain silent and the answer would not incriminate her. The court then stated it would take a brief recess to give defense counsel time to speak with the witness. The court stated: "I'm pursuing this because I believe it's within the proper scope of examination to assess the credibility of the witness when she says the defendant was not her supplier."

After the recess, the court indicated it would provide Bojorquez the opportunity to speak with her attorney. The court stated: "I'm going to order you back tomorrow morning. And this is an extremely important issue because—I'll just explain a couple of different possibilities: If there is some basis, some privilege, for example, for not answering one or more questions, I would then have to consider striking all of your testimony, which, of course, would not be beneficial to the defense case. [¶] Also because part of the testimony involved you . . . admitting that [you are or] were a [methamphetamine] user and admitting that the defendant was a [methamphetamine] user, by refusing to answer the question about where you got your [methamphetamine], even though you denied getting it from the defendant, you could leave the jury with the impression that she was your supplier. So there are some . . . very important issues involved in dealing with your testimony, and I want to make sure that you understand that when you talk to [your attorney]."

The next morning, outside the presence of the jury, defense counsel informed the court she had spoken with Bojorquez's attorney, and the attorney is available to come to court to assist Bojorquez if requested to do so. Defense counsel said that Bojorquez's attorney indicated Bojorquez may be "fear[ful] of potential street retaliation" and that if

7

"the court would be inclined to seal a portion of the transcript that might help alleviate some of the concerns."

The trial court then stated that based on its legal research, it had confirmed Bojorquez had no privilege to refuse to answer the drug-supplier question and the court had the authority to find her in contempt and place her in custody if she did not answer the question. The court told Bojorquez it would exercise this authority if she did not answer the question. The court also said it was willing to seal the record pertaining to Bojorquez's testimony on this issue.

At that point, defense counsel reasserted a relevance objection, stating Bojorquez has now confirmed it was not Dolphin who provided the drugs, and therefore the identity of the person who provided the drugs was not relevant. The court overruled the objection, stating "the jury has the right to decide whether she's telling the truth or lying with regard to" whether Dolphin supplied her with the drugs. The court then reiterated that Bojorquez would be asked the question before the jury and her answer would be sealed. The court said to Bojorquez that if she refused to answer, the court "will order that you be imprisoned until you do," and this would occur in the jury's presence, "mean[ing] a bailiff is going to take you out of the courtroom in handcuffs . . . ." Bojorquez said she understood.

When the jury returned, the prosecutor asked Bojorquez "who did you get the drugs from?" After Bojorquez remained silent, the court stated: "Ms. Bojorquez you need to answer the question. I indicated, for the benefit of the jury, that I would seal any names so that they would not be made public." When Bojorquez continued to

8

remain silent, the court ordered her remanded to custody until she answered the question. As this was being done, the court stated: "I'm going to give the witness a few moments to think about her future, and I apologize to the jury for the inconvenience. We're going to take a short recess, and we will let you know—I'm going to give it about 15 minutes. . . ."

After the recess, the bailiff brought Bojorquez back to the witness stand, and the court asked him to remove her handcuffs. The prosecutor then asked again: "Ms. Bojorquez, who did you get your methamphetamine from?" Bojorquez responded by identifying two individuals (not Dolphin). Bojorquez also testified that her methamphetamine use was "a social thing" and that she would sometimes use the same methamphetamine pipe as did Dolphin. The prosecutor also elicited Bojorquez's testimony that she never saw other people giving Dolphin cash for Hoover's bail bond.

During redirect examination, defense counsel asked questions about Bojorquez's reluctance to identify her supplier:

> "[Defense Counsel:] You weren't really happy about coming back here today, were you?"
>
> "[Bojorquez:] No."
>
> "[Defense Counsel:] And it was hard for you to answer some of the district attorney's questions, wasn't it?"
>
> "[Bojorquez:] Yes."
>
> "[Defense Counsel:] Yesterday you were asked a question, and I just [want] to make sure I get it correctly, but you were asked by the judge, 'Did Ms. Dolphin ever sell you methamphetamine?' And I just want to confirm, what's the answer to that question?"

9

"[Bojorquez:]  No."

"[Defense Counsel:]  You were asked, though, who did provide you with methamphetamine."

"[Bojorquez:]  Yes."

"[Defense Counsel:] And it was hard to answer those questions; is that right?"

"[Bojorquez:]  Yes."

"[Defense Counsel:]  And is that because those people are friends of yours?"

"[Bojorquez:]  One is and one because I was scared."

During closing arguments, defense counsel discussed Bojorquez's reluctance to identify her supplier:  "We heard from Tracey Bojorquez.  It was pretty painful.  She had a really hard time testifying.  It's a friend, of course.  She cares about her.  Of course she doesn't want anything bad to happen to her.  She didn't want to name names.  She was specific:  She never got drugs from [Dolphin].  Took almost going into jail for her to say who she does get her drugs from.  She told you, she acknowledged to you that Ms. Dolphin's a user.  You can't judge [Dolphin] because she's a user.  You have to judge [Dolphin] because of what's being charged.  And you judge the facts of this case, and you hold the government to its burden."

In her reply argument, the prosecutor also briefly addressed Bojorquez's testimony:  "[Y]ou have to question yourself about the credibility of [Bojorquez].  You saw—we all watched painfully—she refused to answer questions.  She didn't want to answer questions.  And, ladies and gentlemen, you get to consider a witness's testimony,

the way that she acted, the way that she testified, et cetera, in considering whether to find her testimony credible or not."

### B. *Analysis*

Dolphin contends she was deprived of a fair trial based on the court's involvement in asking Bojorquez questions and ordering Bojorquez taken into custody once she violated its direct order.

Dolphin forfeited these issues because her counsel failed to object to, or seek a jury admonition regarding, the court's challenged conduct. (See *People v. Snow* (2003) 30 Cal.4th 43, 78; *People v. Fudge* (1994) 7 Cal.4th 1075, 1108.)

Additionally, the contentions lack merit. With respect to the court's direct questions to Bojorquez, a trial judge has " ' " 'the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever [the court] believes [the questioning] may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " ' " (*People v. Harris* (2005) 37 Cal.4th 310, 350; accord, *People v. Cook* (2006) 39 Cal.4th 566, 597.) "The court's questioning must be ' "temperate, nonargumentative, and scrupulously fair" ' [citation], and it must not convey to the jury the court's opinion of the witness's credibility." (*Cook, supra*, 39 Cal.4th at p. 597.)

Under these standards, the court's questions to Bojorquez were appropriate. After Bojorquez refused to answer the prosecutor's question regarding her drug supplier, Bojorquez said she wanted to speak with her attorney. At that point, the parties held a

brief sidebar, and the court then stated it would ask Bojorquez "a couple of questions." The court then proceeded to ask foundational questions regarding the existence of a supplier, i.e., whether a third party or parties supplied the drugs to Bojorquez or whether Bojorquez manufactured the methamphetamine herself. Once the court confirmed that Bojorquez had a supplier and knew the identity of her supplier, the court then repeated the prosecutor's question regarding the identity of the supplier. When Bojorquez again refused to answer, the court excused the jury.

These limited inquiries by the court did not show bias toward the prosecution, and did not reflect the court becoming an advocate for either party. The court's questions were proper as they sought to clarify the grounds for Bojorquez's refusal to respond to the prosecutor's questions and to assess Bojorquez's request to speak with her lawyer. Once the court was satisfied there were no proper grounds for an objection, the court did not err in repeating the prosecutor's question.

On the court's later actions in declaring the witness was in contempt of court and ordering the bailiff to take her into custody, this action was within the court's broad discretion to control the conduct of the trial. (See Code Civ. Proc., §§ 1211, subd. (a), 1219, subd. (a); Pen. Code, § 1044; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1230; see also *In re Willon* (1996) 47 Cal.App.4th 1080, 1089.) The court has the authority to require a witness to answer a question that does not seek privileged information and is not otherwise legally objectionable. (See Evid. Code, §§ 765, subd. (a), 766; see also *People v. Seijas* (2005) 36 Cal.4th 291, 304.) If a witness refuses a court's direct order that he or she answer a valid question, the court may find the witness in contempt of

12

court in the presence of the jury. (See *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1553, 1555-1556.) Moreover, if a defense witness has no constitutional or statutory right to refuse to answer a prosecutor's question, the "[j]urors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony." (*Id.* at p. 1554.)

Dolphin contends it would have been "better" for the court to allow Bojorquez to refuse to answer the question and then permit the prosecutor to argue negative credibility inferences from this refusal, i.e., that Dolphin was in fact Bojorquez's supplier. Although this may have been one available option, the court did not abuse its discretion in deciding to require an answer, particularly because this approach potentially benefited Dolphin's defense. Bojorquez's identification of the third-party suppliers supported Dolphin's defense that she did not sell methamphetamine. And it allowed defense counsel to explain Bojorquez's initial reluctance to respond to the question, e.g., she was scared to name her supplier. If Bojorquez did not answer the question, a strong inference to draw was that Dolphin sold her the drugs. By working to make Bojorquez understand she needed to answer the question, the court was seeking to promote the "effective ascertainment of the truth" and to ensure a fair trial for all parties. (See Pen. Code, § 1044.)

Contrary to Dolphin's contentions, the fact that Bojorquez was placed in handcuffs before the jury did not constitute undue prejudice to Dolphin's case. In the jury's presence, the court told Bojorquez in clear and plain language that she had no privilege to refuse to answer the prosecution's questions and explained the consequences

13

for her failure to answer. When Bojorquez continued to defy the court, the court followed through with its admonishments and ordered her placed in custody. On this record, the jurors would have reasonably understood that the court took these actions as a necessary step to enforcing its orders, and not as a reflection of its views on Bojorquez's credibility or the merits of the defense case. Bojorquez's own actions, and not the court's rulings, were responsible for undermining her credibility. Bojorquez's refusal to follow the court's order to answer the prosecutor's question was a valid factor for the jury to consider in evaluating whether she was telling the truth that Dolphin was not her drug supplier. Dolphin's counsel had the opportunity to argue to the jury that Bojorquez's actions reflected her own discomfort with the question, and should not reflect on Dolphin's guilt. On the record before us, the fact the jury saw Bojorquez placed in handcuffs for violating a direct court order did not deny Dolphin a fair trial.

We also reject Dolphin's suggestion that the trial court should have sua sponte instructed the jury on a witness in custody using CALCRIM No. 337, which tells the jury not to speculate regarding the physical restraint or custody. In this case, the jury was fully aware of the reason Bojorquez was briefly taken into custody. Thus, an additional instruction was unnecessary.

Finally, the court's actions regarding witness Bojorquez were not prejudicial. The evidence presented at trial unequivocally demonstrated that Dolphin was selling drugs. The undisputed evidence shows that at the time of her arrest, Dolphin's purse contained almost nine grams of methamphetamine together with $1,623 in cash (mostly $20 bills), and her text messages showed that she was involved in providing small amounts of the

14

drug to others in exchange for money. Dolphin presented Bojorquez's testimony to support her defense that Dolphin held the $1,623 to use for a bail bond. But Bojorquez's testimony on this issue had little or no probative value given that Bojorquez could identify the source for only $300 of these funds, and this testimony did not relate to Dolphin's possession of the large quantity of drugs or the text messages reflecting methamphetamine sales.

We additionally note that at the outset of the trial, the court instructed the jury: "As a judge, my sole responsibility is to ensure that both sides receive a fair trial. I have absolutely no interest in the outcome of this case. [¶] . . . [P]lease don't infer from anything I say or do that I care what your verdict is. That's completely up to you. My only job is to make sure that both sides receive a fair trial. [¶] And there may be times when I may ask questions of witnesses myself. If I do that, it's not because I'm trying to help or hurt one side or the other. That would be improper. It's only because I believe something needs to be clarified for your benefit to help you decide the case." At the conclusion of trial, the court reiterated that the jury should not "take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be. . . ."

These instructions informed the jury that the trial court's role was limited to an impartial presiding officer, and that the jury should not interpret the court's actions or rulings as intending to favor either side. (*People v. Cook, supra*, 39 Cal.4th at p. 598.) We are required to presume the jury understood and followed these instructions. (See *People v. Harris, supra*, 37 Cal.4th at p. 350.)

15

DISPOSITION

Judgment affirmed.

HALLER, Acting P. J.

WE CONCUR:

McDONALD, J.

IRION, J.